**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dale M. HENDRICKSON,**
**Defendant–Appellant.**

**No. 605, Docket 92–1386.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 4, 1992.

Decided June 13, 1994.

322

Michael H. Sporn, New York City, for defendant-appellant.

Peter A. Norling, Stanley J. Okula, Jr., Asst. U.S. Attys., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., of counsel), for appellee.

Before OAKES, WINTER, Circuit Judges, and SOTOMAYOR, Judge.*

* Honorable Sonia Sotomayor, United States Judge for the Southern District of New York, sitting by designation.

SOTOMAYOR, District Judge:

Defendant Dale M. Hendrickson ("Hendrickson") appeals a final judgment from the United States District Court for the Eastern District of New York, following a jury trial before Sterling Johnson, Judge, convicting him of one count of conspiracy to distribute and possess with intent to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. §§ 841(b)(1)(A)(i) and 846 (1990); two substantive counts of distribution of heroin and possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (1990); two counts of distribution of heroin within one thousand feet of a public school, in violation of 21 U.S.C. §§ 845(a) and 845(a)(1) (1990); and one count of receiving in interstate commerce a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(a)(1)(B) and (2), and 922(k) (1990). The district court found that Hendrickson intended to import 50–60 kilograms of heroin from Nigeria, and set Hendrickson's base offense level at 38. The court then added four (4) points for Hendrickson's role as a leader of five (5) or more people, two (2) points for possession of a nine millimeter handgun, and two (2) points for perjury, bringing the offense level to 46. Judge Johnson sentenced Hendrickson to life imprisonment on the conspiracy count, 240 months on each of the two substantive distribution counts, 480 months on each of the two counts of distribution within one thousand feet of a public school, and 120 months on the firearms count. On appeal, Hendrickson contends principally that the district court erred in its application of the federal Sentencing Guidelines ("Sentencing Guidelines") and that the district court violated his right to a speedy trial.

For the reasons discussed below, we affirm the conviction, but vacate the sentence and remand for resentencing.

## I. BACKGROUND

Hendrickson's conviction was a result of a nearly two-year joint investigation by the United States Customs Service ("Customs") and the Drug Enforcement Administration ("DEA"). In January 1989, Customs and DEA commenced their investigation after receiving a tip from informants Dave Spence ("Spence") and Davis Lee ("Lee") that Hendrickson was searching for a means of transporting large quantities of heroin from Nigeria to New York. Lee introduced Hendrickson to Ken York ("York"), a Customs informant, who posed as a corrupt pilot willing to fly heroin from Nigeria to New York. During their first two meetings, Hendrickson explored a proposed Nigerian importation scheme with York. However, after these early discussions, Hendrickson backed away from the plan, and eventually admitted to York that his Nigerian contacts had no interest in pursuing a deal of that magnitude with him. Indeed, most of Hendrickson's discussions with York during the approximately two-year period centered around Hendrickson's idea to export much smaller quantities of heroin to Bermuda and his efforts to supply York with ounces of heroin. Despite his initial claims of access to substantial quantities of heroin, Hendrickson ultimately was only able to make two sales of heroin, totalling 77 grams, to York.

### A. The Nigeria Importation Discussions

#### 1. The First Meeting

On February 6, 1989, Customs informants Spence, Lee, and York met with Hendrickson and his brother, Mark Hendrickson, at York's undercover offices. At this videotaped meeting, the parties discussed the feasibility of Hendrickson's proposed plan to import 50–60 kilograms of heroin from Nigeria to the United States by private aircraft. Hendrickson claimed that his Nigerian contact had "like a thousand keys," and used "mules"—couriers flying commercial airlines who carried heroin in or on their bodies or in their luggage—to smuggle heroin into the country. Hendrickson told York that his contact was interested in alternate means of exporting heroin to the United States, since the authorities frequently intercepted "mules" at the airports.

The bulk of the meeting was devoted to discussions about the types of aircrafts that potentially could be used, the time York required to arrange a trip to Nigeria, various flight logistics and expenses, and a proposed

time-table for the plan. York demanded a one-third cut in the profits for his piloting services, telling Hendrickson that his interest in the operation was based solely on its promise of large amounts of heroin. Later during the discussion, Hendrickson explained that he planned to distribute the heroin obtained from the Nigerian project in the United States and in Bermuda, where he and his brother already had a distribution network in place.

At the conclusion of this meeting, Hendrickson told York that he would try to have his Nigerian contact attend their next meeting to discuss the plan. However, throughout his conversation with York, Hendrickson was clear that his Nigerian contact had not yet agreed to the plan. Hendrickson advised York that his Nigerian contact had little experience with "this kind of international thing," and that he and York would have to carefully research their proposal before they could convince the Nigerian to agree to it. Hendrickson further noted that his contact was not the ultimate decision maker, and that, even if the contact liked their proposal, the contact would have to "verify" it with his "clique of people."

## 2. *The Second Meeting*

Four days later, Hendrickson and York met a second time. Hendrickson told York that he had met with his Nigerian contact for over three hours, and that the contact was "receptive" to the plan. According to Hendrickson, the Nigerian dealers were importing one kilogram of heroin a week at the time, and that during the course of their meeting, he and the "main guy" had discussed "different options" which "boggled" Hendrickson's "mind." He also claimed that the "main guy" told him that supplying 50 kilograms of heroin was "no problem". However, according to Hendrickson, the contact considered York's demand of a one-third of the profits excessive.

After York agreed to lower his price, Hendrickson quickly changed the conversation to a potential sale of approximately six ounces

of heroin to York. York, concerned that Hendrickson was backing off the Nigeria plan, protested that a six ounce deal was too small, stating that "[a]ny time I operate, I operate big." York tried to get the conversation back to the Nigeria plan, telling Hendrickson, "I thought [you] wanted like fifty keys or somethin' like that." Hendrickson explained, however, that York's piloting services were unnecessary at that time because mule carriers were providing his suppliers with sufficient quantities of heroin. Undeterred, York pressed Hendrickson to introduce him to his Nigerian contacts so that he could convince them that importing heroin via private aircraft was not only superior to their present mule-carrying method, but also "one hundred percent guaranteed." During the remainder of the conversation, York and Hendrickson discussed various financing ideas that Hendrickson could propose to the Nigerians.

## 3. *The Third Meeting*

Two months later, on April 18, 1989, York and Hendrickson met again, this time at an airport. Hendrickson provided York with a sample of heroin.[1] When York inquired about the Nigerian plan, Hendrickson explained that heroin continued to be smuggled into New York by mule carriers and therefore, York's piloting services would not be needed. The following exchange then took place:

> **York:** "So what are you sayin[g]? Are you telling me that you are cancelling Africa?"
>
> **Hendrickson:** "why fly there and go through ... expenses when the.. thing has been transferred for me right here." * * * "[W]hy fly half way around the world when **we don't have the funds to go.**" (Emphasis added).

Hendrickson further explained that the Nigeria plan was on "hold," and that they should "deal where O.K. the money is ... coming from." By this, Hendrickson was referring to his heroin operations in Bermuda and his plan to use the funds raised in his

---

1. Neither the record before us nor the parties' briefs, indicated the quantity or purity of this    heroin sample.

Bermuda operation to, at some later date, finance the Nigerian project. Hendrickson invited York to invest in this plan and fly about ten kilograms of heroin from New York to Bermuda. During this meeting, Hendrickson mentioned that his Nigerian contact was named "Balogun."

On May 7, 1989, Hendrickson introduced York to Balogun who, Hendrickson explained, was importing heroin from Africa through John F. Kennedy Airport ("Kennedy Airport") in New York City, and could produce any amount of heroin York desired. The record before us does not indicate what negotiations, if any, occurred during this meeting.

After this meeting, York and Hendrickson's drug dealings turned to sales of small quantities. Although York continued to pressure Hendrickson to proceed with the Nigerian plan, Hendrickson retreated from the idea, and ultimately admitted that his Nigerian contact was not interested in his Nigerian importation plan.

## B. *The First Sale of Heroin*

On June 29, 1989, Hendrickson and an individual named Tony (whom Hendrickson described as his "lieutenant") met with York and Al Armstrong ("Armstrong"), an undercover DEA agent, whom York introduced to Hendrickson as a potential purchaser of small quantities of heroin. During this meeting, Hendrickson offered to sell York and Armstrong six to seven ounces of heroin. York showed Hendrickson $40,000 of buy money and Hendrickson promised to supply the heroin the following day.

Hendrickson, however, failed to supply the drugs. He later explained to York that his supplier's mule carrier had been arrested at Kennedy Airport. Indeed, one month prior to Hendrickson's June meeting with York, authorities had arrested a man named Sunday Adenekan Phillips ("Phillips") after finding heroin strapped to his body upon his arrival from Nigeria. At Phillips' arrest, DEA agents seized an address book from him containing the names and telephone numbers of Hendrickson, Balogun and Ste-

phen Uchannaya ("Uchannaya"). York testified that Hendrickson had identified Uchannaya, a Nigerian national, as an alternate supplier of heroin.

At a subsequent meeting in July 1989, York expressed his frustration with Hendrickson's delay of the Nigerian plan. York complained that "the man come to me in February. We supposed to take, take the uh both to Nigeria to get the [heroin] and bring it back right.... Then nothing happen with that." Hendrickson replied that his contact's "mule trading" was producing heroin weekly from Nigeria.

On August 10, 1989, York made yet another failed attempt to purchase heroin from Hendrickson's source. This time, Hendrickson and York travelled to a video store owned by Uchannaya. Hendrickson introduced York as a pilot willing to fly large quantities of heroin into New York. Uchannaya informed York that he had access to 500 kilograms in Thailand, and desired an alternate importation method since some of his couriers had been arrested. The parties agreed to meet the next day so that York could purchase 600 grams of heroin and further discuss Hendrickson and York's smuggling proposal.

However, the next day, when Hendrickson called York to tell him that Uchannaya was on his way with the heroin, York was unable to obtain the buy money, and the deal dissolved. When York and Hendrickson spoke later that day, Hendrickson complained that York's failure to purchase the heroin had severely weakened his credibility with Uchannaya. Hendrickson explained that "these are not my people I work with all the time the (*sic*) don't give me that kind of quantity to hold, you understand what I'm trying to show you? .... *The people* (U/I) [2] *are new to me.*" (Emphasis added). Later, Hendrickson told York that he could not "deliver the product because there's none around," and that it was "better [that he] ... just work on [his] ... little thing". York reminded Hendrickson that the Nigerian project was still an option, and that Uchannaya "would go for the deal". Hendrickson

---

**2.** "U/I" refers to unintelligible portions of the     recorded statements.

replied that Uchannaya was only an "emergency" source, and York's inability to go through with the planned purchase had strained their credibility with Uchannaya. York insisted that they pursue the Nigerian plan, asserting that he was ready, willing and able to proceed. Finally, Hendrickson admitted that he did not have an agreement with the Nigerians, replying:

> "[W]hat I am trying to say, *these people are people like this you remember you say bring them over he say look he don't want to go nowhere,* don't want to know nothing all *he wants as things go on gradually things would get better,* you understand? *I can't make base one, how the hell I going to run to base three?*" (Emphasis added).

York did not press the issue, shifting the conversation back to the failed purchase. He inquired whether an alternate transaction arranged for the following week was still on. Emphasizing yet again that he had no experience dealing with large transactions, Hendrickson replied that he "was lucky enough to get that quantity here one time," and that he did not know if the proposed sale would take place.

Finally, on August 22, 1989—a full ten months after the investigation started and five months after Hendrickson first provided York with a sample amount of heroin—Hendrickson and York consummated their first deal for one ounce of heroin.[3] DEA laboratory analysis later revealed that this heroin had 84% purity.

## C. *The Bermuda Heroin Operations*

During one of their initial conversations, Hendrickson told York that he wanted to purchase a high-speed powerboat to aid his Bermuda heroin operations. Hendrickson explained that with a powerboat, his brother Mark could pick up heroin dropped from cruise ships traveling between New York and Bermuda.

In September, 1989, after his first drug purchase, York drove Hendrickson and his wife, Marie Catalano Hendrickson ("Catalano"), to a Long Island marina, where Hendrickson deposited $1000 in cash on a $42,000 speed boat, telling York that he needed to raise additional capital to complete the purchase of the boat.[4]

During their trip to the marina, York asked Hendrickson "[w]hat happened to the African guys?" When Hendrickson replied that they had returned, York suggested that he and Hendrickson meet with them. Hendrickson responded, "[l]et's just deal with my thing first ... About 200, 200 grams is what, ahm, three, six, seven ounces."

Later that month, Hendrickson advised York that he was leaving for Bermuda to oversee his drug operations there and to obtain funds to finance his heroin deals with York. From Bermuda, Hendrickson sent Catalano two checks totaling $6,000, which she turned over to York.

Following his return from Bermuda, Hendrickson and his wife met with York to discuss future drug transactions. During these meetings, York insisted that Hendrickson speak to his Nigerian connection about the long-delayed heroin importation plan. Hendrickson told York that if he desired to go forward with the plan, York would have to deal directly with the Nigerian. Hendrickson further stated that his Nigerian contact would soon be in the area, and that the contact probably was not interested in importing more "than about fifty keys." Hendrickson turned the conversation to his heroin operations in Bermuda, which he claimed were very successful. Hendrickson boasted that he had "people waiting on the street in" Bermuda, and that he "r[an] the whole ... island". He further claimed that "for every little half gram . . . . five hundred U.S. dollars ... goes into my hand ... so one ounce is twenty-eight thousand dollars I make and nobody else have no market like that nowhere around."

---

**3.** One ounce is equivalent to twenty-eight (28) grams.

**4.** Hendrickson never did purchase the speed boat. However, he purchased a Jaguar automobile for $15,000 in early October 1989, and made a $7,000 down payment on a home in Jacksonville, Florida that following November.

Despite Hendrickson's boasts, his proposed heroin distribution network from New York to Bermuda never materialized. No heroin was sent to Bermuda, nor was any currency returned to the United States through York's piloting services.

### D. *The Second Heroin Sale*

Through a series of conversations from October 31, 1989 through November 15, 1989, York arranged to have Hendrickson supply him with additional heroin. During these discussions, Hendrickson told York that he supplied heroin to several individuals who then resold the heroin locally. Hendrickson advised York that he recently had met with "the Africans," who claimed to have 60 kilograms of heroin for sale. However, Hendrickson told York that "the Africans" were not interested in securing York's piloting services because York was American and did not have collateral. Hendrickson instead offered to sell York two ounces of heroin for $7,500 per ounce; York agreed, but expressed disgust over the seemingly failed Nigerian plan.

> York: This man, this guy he was telling me we gonna be making all this money U/I ...
>
> Hendrickson: [I]*f I can't do one little something, how the hell am I going to jump into a big project like that* and you have me making the people who supposed to give me the break on this thing. You're making them go like a yo-yo. Explain that to me now. (Emphasis added).

The following day, on November 15, 1989, Hendrickson sold York approximately 1.7 ounces of heroin, which lab tests later showed had 79% purity.

Unable to obtain more than small amounts of heroin from Hendrickson, York, in January 1990, bypassed Hendrickson and attempted to deal directly with Balogun. This attempt, however, backfired, and Hendrickson later scolded York for his overture, claiming that York had made Balogun nervous, and that his actions might have frustrated Hendrickson's efforts to arrange "something big".

Notwithstanding his numerous failed attempts to get the "big deal" moving, York again tried to revive the Nigerian project three months later on March 12, 1990. York urged Hendrickson to proceed with the Nigeria plan: "I'm ready to go to Africa. You keep telling me we're going to Africa. I'm ready to go to Africa ... Are we going to Africa or not?" Later in the conversation York pressed further: "why you holding back ... why you procrastinating? Are you afraid of success?" Hendrickson attempted to change the subject several times; York, however, persisted. Finally, Hendrickson told York that he anticipated that they would be able to "hook up the bigger deal" at some point, but remarked that the Nigerian project was not as "easy" as York made it sound.

On November 14, 1990, York negotiated another heroin purchase from Hendrickson, this time for four ounces of heroin. York and DEA agent Armstrong arranged to pick up the heroin from Hendrickson at his home the following day. However, when they arrived, Hendrickson told them that he had not yet received the heroin from his African supplier. Deciding not to wait any longer, surveillance agents placed Hendrickson under arrest, and searched his home. The search yielded a nine millimeter handgun with its serial number obliterated, a loaded ammunition clip and a triple beam balance; however, no narcotics were found.

## II. THE SPEEDY TRIAL MOTION

The original indictment in this action was filed on November 26, 1990. Hendrickson was arraigned before Judge Reena Raggi on December 10, 1990. Superseding indictments were filed on February 1 and April 2, 1991. Thereafter, Hendrickson filed pre-trial motions on May 31, 1991. Following oral argument on August 16, Judge Raggi denied all of the motions and determined that 62 days remained under the Speedy Trial Act. Hendrickson does not challenge the speedy trial calculation up to this date.

On September 13, 1991, Judge Johnson, to whom the case was reassigned, held a pre-trial conference during which Hendrickson requested reconsideration of Judge Raggi's earlier decision denying his motion to sup-

press two tapes whose authenticity Hendrickson challenged. Judge Johnson asked Hendrickson's counsel whether Hendrickson's request should be treated as a motion. Defense counsel stated that it should, and advised that the motion for reconsideration might require a hearing. Judge Johnson stated that he would treat the request as a motion and excluded the time for consideration of this motion from the speedy trial clock. Judge Johnson also set a briefing schedule for defense counsel to submit papers in support of Hendrickson's motion,[5] and rescheduled the trial date previously set by Judge Raggi from September 16 to October 7, 1991.

Because Judge Johnson was unavailable on that date, the trial date was changed from October 7 to November 5. Thereafter, defense counsel was unavailable, and the court adjourned the trial to January 13, 1992. When the Bureau of Prisons failed to produce co-defendant Catalano on January 13, 1992 because of a transfer necessitated by overcrowding, the court moved the trial date to February 19, 1992.

On January 14, 1992, Hendrickson filed a "Motion for Severance Due to Multiple Conspiracies." A month later, on February 14, 1992, Hendrickson filed a motion to dismiss the indictment for violation of the Speedy Trial Act ("STA").

Judge Johnson heard argument on Hendrickson's outstanding motions on February 19, 1992. At the hearing, Hendrickson's attorney argued that the period from Judge Raggi's August 16 denials of Hendrickson's motions until November 5, when defense counsel became unavailable, were not periods of delay to be excluded under the STA. Defense counsel claimed that the court should have ignored papers filed by a defendant represented by counsel, and that such papers were not motions that stopped the speedy trial clock. Defense counsel also challenged the district court's exclusion of the period

from January 13 to February 19, 1992, when the co-defendant was lost in the Bureau of Prisons system.

Judge Johnson denied Hendrickson's motions and observed:

> Mr. Hendrickson cannot have it both ways. He files motions and under the statute the time is tolled. He cannot file motions and then cry that he is not having a speedy trial.

Thereafter, the trial proceeded and resulted in Hendrickson's conviction.

### III. SENTENCING

At the sentencing hearing on June 26, 1992, defense counsel objected to the presentence report's proposed finding that Hendrickson conspired to distribute between 50 and 60 kilograms of heroin and the report's corresponding recommendation that Hendrickson be sentenced to life imprisonment. Defense counsel emphasized that Hendrickson had contended consistently throughout the trial that he had lied to York about his ability to carry out the scheme to import 50–60 kilograms of heroin from Nigeria. Defense counsel further noted that during the course of the twenty-two month investigation, Hendrickson had only supplied York with a total of 77 grams of heroin, and after the initial conversations about the Nigerian plan, it was York, not Hendrickson, who continued to express interest in the plan. Counsel further argued that the evidence clearly showed that Hendrickson repeatedly tried to avoid the subject, and ultimately admitted to York that his professed "connections" were not willing to engage in a transaction of the magnitude of the proposed Nigerian deal. Based on these facts, Hendrickson's counsel argued that the Government had failed to establish, as required by former Sentencing Guideline § 2D1.4 (1991), that Hendrickson had the intent and capability to produce 50–60 kilograms of heroin.

---

5. The Government in its brief states that after the September 13 conference, Hendrickson filed additional papers in support of his motion for reconsideration. However, Hendrickson's attorney did not. On the record before us, it is unclear when Hendrickson filed his papers, although Judge Johnson at the hearing on Hendrickson's speedy trial motion, mentioned that he had received papers from Hendrickson concerning his motion for reconsideration. Judge Johnson also alluded to having received various other motions from Hendrickson. None of those motions or papers, except for the severance and speedy trial motions, were placed in the record before us.

The Government countered that, under former Sentencing Guideline § 2D1.4, the defendant bore the burden of proving that he lacked intent to produce and was not reasonably capable of producing 50–60 kilograms of heroin. The Government maintained that Hendrickson's detailed discussions about the Nigerian plan, the high-level purity of the heroin he sold to York and his access to well-connected drug dealers, clearly demonstrated both his intent and capability to import 50–60 kilograms of heroin from Nigeria.

In determining the quantity of narcotics that established the defendant's base offense level, Judge Johnson focused on the initial conversations between Hendrickson and York, which, in Judge Johnson's view, evinced Hendrickson's "willing[ness] to purchase, lease or rent an airplane to travel from the United States to Nigeria to pick up heroin". Sentencing Hearing Transcript ("Tr.") at 22. Concluding that these conversations demonstrated Hendrickson's intent to produce 50–60 kilograms of heroin, Judge Johnson found that "the government has substantiated its claim that at least 50, 60 kilograms of heroin was the subject of the conspiracy". *Id.* Judge Johnson summarily dismissed Hendrickson's argument that he lacked the capability to produce these amounts, stating "I think he was capable of doing it." Tr. at 24. The district court set the base offense level at 38, and adjusted the offense level upwards eight points for a final offense level of 46. None of these adjustments are at issue in this appeal.

**IV. DISCUSSION**

On appeal, Hendrickson contends: (1) that his sentence should be vacated because the district court erred in finding that he intended to import 50–60 kilograms of heroin from Nigeria, without ever considering his ability to produce such amounts; and (2) that his conviction should be reversed and the indictment dismissed because his Speedy Trial Act rights were violated. Though Hendrickson's Speedy Trial Act claims are groundless, we find some merit in his sentencing challenge, and for the reasons set forth below, vacate his sentence and remand for resentencing.

**A.** *Calculating the Base Offense Level*

The Sentencing Guidelines establish a sentencing regime which ties punishment for narcotics crimes to the quantity of drugs involved. Former Sentencing Guideline § 2D1.4, in effect at the time of Hendrickson's sentencing,[6] directed district courts to set the base offense level for a drug conspiracy conviction as if the conspiracy's goal had been realized. Specifically, former Sentencing Guideline § 2D1.4 provided:

> Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

Where the drug conspiracy involved "uncompleted distributions" of narcotics, Application

---

**6.** While this appeal was pending, the Sentencing Commission deleted Sentencing Guideline § 2D1.4 (1991), and transferred much of the Commentary, including the relevant portion of Application Note 1, to Application Note 12 of Sentencing Guideline § 2D1.1, which sets forth the base offense level for various substantive narcotics crimes. Amendment 447 to the United States Sentencing Guidelines, Guidelines Manual, Appendix C, 269–271 (effective November 1, 1992). The amendment also added the phrase "Attempt and Conspiracy" to the heading of Sentencing Guideline § 2D1.1. The accompanying commentary states that Amendment 447 was designed to consolidate substantive and inchoate drug offenses under one sentencing guideline. *Id.* at 271.

At oral argument we requested, and thereafter obtained, additional briefing from the parties as to whether Amendment 447 affected Hendrick-

son's sentence. Both parties agree, albeit for different reasons, that this amendment should not change our decision in the present case. We agree. The amendment before us merely underscores our holding that the intent and capability inquiry set forth in Application Note 1 to former Sentencing Guideline § 2D1.4 is part and parcel of the base offense determination.

However, we reject the Government's argument that we could not consider Amendment 447 if it assisted our inquiry. This amendment merely "clarifies and simplifies the guideline provisions dealing with attempts and conspiracies," and our prior case law makes clear that we can consider, on appeal, amendments that do not substantially change the Guidelines used at sentencing. *United States v. Colon,* 961 F.2d 41, 45 (2d Cir.1992); *United States v. Perdomo,* 927 F.2d 111, 116–17 (2d Cir.1991).

Note 1 to former Sentencing Guideline § 2D1.4 explained that the "weight under negotiation" set the base offense level.

> If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount.

However, in such cases, Application Note 1 also directed courts to exclude from the base offense calculation those drug amounts which the defendant neither intended to produce nor was reasonably capable of producing.

> [W]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the calculation the amount that it finds the defendant did not intend and was not reasonably capable of producing.

■ The Sentencing Commission amended Application Note 1 to include this third sentence in 1989. Amendment 136, United States Sentencing Guidelines Manual, Appendix C, 64 (effective Nov. 1, 1989) (hereinafter "Amendment 136"). This sentence replaced language in the original Application Note 1 which permitted downward departures from the offense level "[w]here the defendant was not reasonably capable of producing the negotiated amount." *See* Amendment 136. As the accompanying commentary to Amendment 136 explained, the purpose of the 1989 change was to insure that courts did not calculate the base offense level using amounts as to which the defendant was merely "puffing," i.e., amounts the defendant did not intend to produce. Amendment 136 ("[t]he purpose of this amendment is to provide a more direct procedure for calculating the offense level," than that provided by the downward departure mechanism, "where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount").

The parties dispute whether the Government or the defendant bears the burden of proof in the intent and capability inquiry of Application Note 1. The Government contends that once it establishes the "negotiated amount" of narcotics, the defendant bears the burden of proving that he or she neither intended to produce nor was capable of producing that amount. Noting the first Application Note's language of exclusion, the Government asserts that the intent and capability inquiry is tantamount to a downward departure mechanism for which the defendant bears the burden of proof. Hendrickson instead argues, without explanation, that the Government must prove his intent and capability to produce a disputed amount of narcotics.

We have never expressly addressed whether the Government or the defendant bears the burden in the first Application Note's intent and capability query. Other Circuits that have addressed the question are split. The Sixth and Ninth Circuit analogize the intent and capability inquiry to evaluating a mitigating factor since a finding of lack of intent and reasonable capability ultimately benefits the defendant. Thus, viewing the intent and capability inquiry as distinct from the "negotiated amount" determination, these Circuits have shifted the burden to the defendant to prove lack of intent and capability once the Government proves the negotiated amount. *United States v. Barnes,* 993 F.2d 680, 683 (9th Cir.1993); *United States v. Christian,* 942 F.2d 363, 368 (6th Cir.1991), *cert. denied,* ––– U.S. –––, 112 S.Ct. 905, 116 L.Ed.2d 806 (1992); *United States v. Rodriguez,* 896 F.2d 1031, 1033 (6th Cir.1990).

In contrast, the First and Seventh Circuits, apparently viewing the inquiry as the means by which the negotiated amount is established, have required that the Government prove the defendant's intent and ability to produce specified amounts of narcotics. *See United States v. Legarda,* 17 F.3d 496, 500 (1st Cir.1994) (Government must show "both intent and ability to deliver in order to allow the inclusion of negotiated amounts to be delivered at a future time"); *United States v. Ruiz,* 932 F.2d 1174, 1183–84 (7th Cir.1991) ("Government bears burden of proving amount under negotiation, and contested amount could not be under negotiation if defendant lacked the intent to produce such amount"), *cert. denied,* ––– U.S. –––, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991).

We believe that the Seventh Circuit's view on this issue, as expressed in *Ruiz*, is more consistent with the purpose and language of former Sentencing Guideline § 2D1.4.

As our past decisions have recognized, the Government bears the burden of proving the amount of drugs involved in narcotics transactions, *see United States v. Colon*, 961 F.2d 41, 43 (2d Cir.1992), and for drug conspiracies, former Sentencing Guideline § 2D1.4 made clear that this translated into proving the amount of drugs that was the conspiracy's "object." The first Application Note to Sentencing Guideline § 2D1.4 explains that where uncompleted transactions are at issue, the conspiracy's "object" is the amount of drugs "negotiated". Yet, since the focus of former Sentencing Guideline § 2D1.4 is the unlawful *agreement* to produce narcotics, the conspiracy's "object," and thus, the "negotiated amount" in these cases, must be the *amount* of narcotics the conspirators *agreed* to produce. This critical agreement can not exist without a "meeting of the minds" of at least some of the co-conspirators to produce a specified amount of narcotics for a given price.

■ Proving the *intent* of at least two co-conspirators to produce a certain amount of narcotics is essential to proving a conspiratorial agreement as to that amount. Thus, where the Government asserts that the defendant personally "negotiated" to produce contested quantities—and not that the defendant is merely secondarily liable for an agreed upon amount as a participant in an alleged conspiracy—the Government bears the burden of proving that the defendant *intended* to produce such an amount. In such cases, the defendant's "ability" and that of his co-conspirators to produce a particular amount play an important, though not dispositive, role in establishing the defendant's intent to produce this amount, and thereby, the conspiratorial agreement as to such amount.

Obscuring the centrality of the conspiratorial agreement in the Sentencing Guideline § 2D1.4 base offense determination, the language and form of the first Application Note's intent and capability inquiry has prompted mistaken analyses of the Government's burden of proof at the base offense stage. As the conflicting decisions of other circuits and of different panels of this circuit amply illustrate, *see* Section A(1)(b) *infra*, courts enmeshed in the wording and structure of the first Application Note's third sentence often have turned the base offense determination on its head, by suggesting (1) that the defendant's intent and capability decrease the base offense rather than define it, despite the Government's claim that a defendant personally agreed with others to produce a particular amount; and (2) that a defendant's ability to produce a certain amount, regardless of his or her intent to do so, is a proper basis for punishment.

Accordingly, for the reasons discussed below, we structure our base offense analysis in cases governed by former Sentencing Guideline § 2D1.4 in accordance with that Guideline's language and purpose, rather than the literal language of its Application Note 1. The conspiratorial agreement to produce a particular quantity of narcotics should be informed by all of the circumstances of the case, notably the conspirators' intent to produce such amounts. Thus, where the Government asserts that a defendant negotiated to produce a contested amount, we hold that the Government bears the burden of proving the defendant's intent to produce such an amount, a task necessarily informed, although not determined, by the defendant's ability to produce the amount alleged to have been agreed upon.

### 1. *Burden of Proof*

■ We begin our burden of proof analysis with the well-established rule that at sentencing for drug-related offenses, the Government bears the burden of proving the amount of narcotics involved, since it is this amount that establishes the base offense level. *Colon*, 961 F.2d at 43 (Government must prove quantity of drugs involved by a preponderance of the evidence). *See also United States v. Smiley*, 997 F.2d 475, 481 (8th Cir.1993) ("government bears the burden of proof by a preponderance of the evidence the quantity of the drug involved"); *Barnes*, 993 F.2d at 683 ("government bears the burden of proving the amount under negotiation").

### a. *Former Sentencing Guideline § 2D1.4*

■ In drug conspiracies, the conspirators' agreement to produce narcotics, not the actual possession, sale or delivery of the drugs, is the essence of the crime. *United States v. Labat,* 905 F.2d 18, 21 (2d Cir.1990) ("the essence of conspiracy is the agreement and not the commission of the substantive offense that is its objective"); *United States v. Tejada,* 956 F.2d 1256, 1264 (2d Cir.) ("agreement defines the conspiracy"), *cert. denied,* —— U.S. ——, 113 S.Ct. 124, 121 L.Ed.2d 80 (1992); *see United States v. Rubin,* 844 F.2d 979, 983 (2d Cir.1988) ("The fundamental element of a conspiracy is unlawful agreement.").

Former Sentencing Guideline § 2D1.4, "displaying a clear resolve to punish the [conspiratorial] agreement," commands that the object of the conspiracy set the base offense level. *Tejada,* 956 F.2d at 1264. Since the agreement defines the conspiracy, it follows that the conspiracy's "object" must be the amount of narcotics the conspirators' *agreed* to produce. Clearly, a conspiratorial agreement to produce a specific type and quantity of narcotics can be formed without the assent or participation of every member of the conspiracy. Indeed, the Sentencing Guidelines, in defining "relevant conduct," provide that a defendant will not be liable for drug quantities that co-conspirators agreed to produce which were not reasonably foreseeable in the criminal activity the defendant agreed to undertake and as to which the defendant lacked knowledge. Sentencing Guideline § 1B1.3, Application Note 2 (1993) ("[t]he conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct"); *United States v. Negron,* 967 F.2d 68, 72 (2d Cir.1992) (defendant not liable for drug quantities which were not reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake); *United States v. Cardenas,* 917 F.2d 683, 686–87 (2d Cir.1990) (same).

■ However, it is axiomatic that no conspiratorial agreement exists unless at least two culpable co-conspirators agree, and consequently, the defendant's agreement must be with someone other than a government agent or informant. *Montgomery v. United States,* 853 F.2d 83, 85 (2d Cir.1988). Moreover, to establish a conspiratorial agreement, the Government must demonstrate that the conspirators possessed " 'at least the degree of criminal intent necessary for the substantive offense itself.' " *Ingram v. United States,* 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959) (citation omitted); *United States v. Fletcher,* 928 F.2d 495, 501–02 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991); *United States v. Gurary,* 860 F.2d 521, 525 (2d Cir. 1988). More specifically, proof of a conspiratorial agreement requires evidence, which may be circumstantial, that the conspirators *intended* to agree to commit an unlawful act. *Cf. United States v. Tyler,* 758 F.2d 66, 70–71 (2d Cir.1985) (conspiratorial agreement requires more than the " 'community of unlawful intent' " required for aiding and abetting liability) (quoting *United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980)) (citations omitted). Here, the conspirators were charged with and convicted of conspiracy only to distribute and possess with intent to distribute "an amount in excess of one kilogram" of heroin.

■ Consequently, to satisfy its burden of proving a conspiratorial agreement as to a greater quantity of narcotics, the Government was required to prove that the conspirators *intended* to produce, i.e., *agreed* to produce, such amounts. Where the Government asserts that a defendant directly participated in the conspiratorial agreement to produce a specified amount and type of narcotics, the Government must prove that such defendant *intended* to produce that amount. The Government bears the burden of proving the defendant's intent to produce such amounts because it is this intent, along with the intent of culpable co-conspirators, that defines the conspiratorial agreement which former Sentencing Guideline § 2D1.4 seeks to punish.

■ We emphasize, however, that this situation is radically different from that posed when the defendant does not challenge the charged amount of narcotics, but instead as-

serts that such amount should not be attributable to him or her as relevant conduct pursuant to Sentencing Guideline § 1B1.3. There, the Government has already met its burden of proving the conspiratorial agreement to produce a specified quantity of drugs; the only question is whether a particular defendant should be held responsible for this specific agreement, despite his or her lack of involvement in its formation. We have held that in relevant conduct cases, the defendant must prove his or her lack of knowledge and lack of foreseeability of the quantities agreed upon by other co-conspirators. *United States v. Negron*, 967 F.2d 68, 72 (2d Cir.1992) ("when a defendant asserts that he is not responsible for the entire range of misconduct attributable to the conspiracy of which he was a member, the Sentencing Guidelines place on him the burden of establishing the lack of knowledge and lack of foreseeability"). The defendant properly bears the burden of proving these elements, because at the relevant conduct stage, the Government has already satisfied its burden of proving (1) that the defendant participated in the conspiracy and (2) that culpable co-conspirators agreed to produce the contested amount of narcotics.

By contrast, where the conspiratorial agreement to produce particular drug quantities is itself at issue, the conspirators' agreement, hence intent, to produce a particular amount is integral to the Sentencing Guideline § 2D1.4 base offense determination. The task of discerning this agreement is clearly informed by the conspirators' ability to produce such an amount, since former Sentencing Guideline § 2D1.4 seeks to punish unlawful agreements, not merely wishful thinking or exploratory discussions. Thus, where the Government asserts that a defendant was directly involved in the agreement to produce specified quantities of narcotics, the critical inquiry in the base offense determination is whether that defendant *agreed,* i.e., *intended,* to produce the contested amount.

The language of the third sentence of Application Note 1 obfuscates this rather straightforward point. By confusing the role of "intent" and "capability" in defining the base offense level, the wording and structure of this sentence has fostered misguided analyses of the base offense determination.

#### b. *Application Note 1*

Application Note 1 was designed to interpret and implement former Sentencing Guideline § 2D1.4. *See Stinson v. United States,* — U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (commentary to Sentencing Guidelines "is akin to an agency's interpretation of its own legislative rules"). Though the focus of former Sentencing Guideline 2D1.4 is the conspirators' agreement, Application Note 1 does not employ the term "agreement" or any derivation thereof. Instead, for uncompleted drug transactions, the first Application Note's second sentence directs courts to use "the weight under negotiation" in calculating the base offense level.

"When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* — U.S. ——, ——, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993). Webster's Dictionary defines "negotiate" as "to meet with another so as to arrive through discussion at some kind of agreement or compromise about something." *Webster's Third New International Dictionary of English Language* 1324 (1986). Black's Law Dictionary states that to "negotiate" is "[t]o transact business; to bargain with another respecting a transaction; to conduct communications or conferences with a view to reaching a settlement or agreement." *Black's Law Dictionary* 1541 (6th ed.1990).

However, the term "negotiation" under both these definitions would encompass discussions tentative in nature as well as those that have achieved a greater degree of finality. "Language, of course, can not be interpreted apart from context." *Smith,* — U.S. at ——, 113 S.Ct. at 2054. Thus, as used in Application Note 1, "negotiation" must describe dealings closer to the agreement end of the spectrum, since the conspiracy's "object" can only be the amount of narcotics the conspirators *agreed* to produce, not that which was merely discussed. The conspirators' intent, and the factors which bear upon

this intent, notably the conspirators' ability to produce specified amounts, is thus inherent in the "weight under negotiation" concept. As we noted above, where the Government asserts that a particular defendant "negotiated" a specified quantity of drugs, the amount of drugs that defendant *intended* to produce informs the conspiratorial agreement as to amount, and consequently, the "weight under negotiation".

The language and structure of Application Note 1, however, confuses the integral role of this agreement in determining the "weight under negotiation," and thereby the base offense level. Application Note 1 provides that "where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, it shall exclude from the Sentencing Guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing." Former Sentencing Guideline § 2D1.4, Application Note 1 (1991). Since exclusion implies diminution, and the term "negotiation" encompasses a wide range of activities, the first Application Note's third sentence suggests that the "negotiated amount" could be an amount greater than that which the defendant intended to produce. Thus, courts could conclude that the amount of drugs the defendant intended to produce is distinct from, rather than the essence of, the "negotiated amount" or base offense.

This apparently is precisely the conclusion reached by the Sixth and Ninth Circuits as evidenced by their analogy of intent and capability to mitigating factors. In *Barnes,* the Ninth Circuit reasoned that the exclusionary language "indicate[d] that the baseline is the inclusion of the *entire negotiated amount;* it is only when the district court affirmatively makes the finding that the offense level is lowered." *Barnes,* 993 F.2d at 684 (emphasis added). Since the intent and capability inquiry could potentially "lower[ ] the offense level," the *Barnes* court deemed that intent and capability "combined ...

[were] more properly characterized as a mitigating factor for which the defendant b[ore] the burden." *Id.* at 683–84. The Sixth Circuit seems to be in accord with this reasoning. *See Rodriguez,* 896 F.2d at 1033 (defendant bears the burden of proving intent and capability, since like mitigating factors, they have the effect of decreasing the defendant's sentence). However, since former Sentencing Guideline § 2D1.4 mandates that the "object of the conspiracy" determines the base offense level, the "baseline" can only be the amount of drugs the conspirators *agreed* to produce. Thus, the analogy to mitigating factors must fail, since the conspirators' intent to produce specified drug quantities, informed by their ability to do so, does not *lower* the base offense: it defines the base offense level.[7]

The conjunctive wording of the first Application Note's "intent and capability" standard has further confused the Sentencing Guideline § 2D1.4 base offense determination. By suggesting that intent and capability are independent co-equal factors, this language has led courts, including courts in this Circuit, to suggest that sentencing on the basis of amounts the defendant *never intended* to produce is required where the defendant had the ability to produce such amounts. For example, in our recent decision in *United States v. Howard,* 998 F.2d 42, 50–51 (2d Cir.1993), we interpreted the first Application Note's intent and capability inquiry as requiring a finding of *both* lack of intent and lack of ability before a contested amount could be excluded from the guideline calculation. *Id.* ("given quantity of narcotics will not be charged to a defendant if the defendant *both* was not reasonably capable of producing *and* did not intend to produce the amount of narcotics at issue") (emphasis added). The logical converse of this proposition is that contested amounts must be included where one of these elements—intent or capability—exists. Since the *Howard* court was faced with a lack of ability challenge, the

---

**7.** Indeed, this rationale harkens back to the downward departure system the Sentencing Commission abandoned when it amended Application Note 1 in 1989 to require courts to follow the "more direct procedure" of excluding drug

amounts that the defendant neither intended to produce nor was reasonably capable of producing when calculating the base offense level. Former Sentencing Guideline § 2D1.4 (1989).

court did not address the implications for sentencing when the missing element is the defendant's *intent* to produce the contested amount. *See also United States v. Brooks,* 957 F.2d 1138 (4th Cir.1992) (Application Note requires a showing of both lack of intent and lack of reasonable capability before a contested amount will be excluded from the guideline calculation), *cert. denied,* —— U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992); *Barnes,* 993 F.2d at 682 n. 1 (language of Application Note is conjunctive, not disjunctive, and "[t]hus, the district court would have to find *both* lack of intent and lack of capability before excluding the amount") (emphasis in original). Thus, the first Application Note's literal language implies that mere opportunity, regardless of intent, is a sufficient and appropriate basis for punishment. This interpretation, however, is at odds with the language and purpose of Sentencing Guideline § 2D1.4, whose focus is the conspiracy's object or agreement, not its mere potential.

Not surprisingly, several courts, including courts in this Circuit on at least two occasions, have read the "intent and capability" standard disjunctively. *See, e.g., United States v. Stevens,* 985 F.2d 1175, 1183 (2d Cir.1993) (though citing conjunctive language, panel remanded with instructions to the district court to exclude amount defendant was not reasonably capable of producing in sentencing); *Tejada,* 956 F.2d at ·1264 (amount excluded where "the defendant did not intend *or* was not reasonably capable of supplying the agreed upon amount") (emphasis added); *United States v. Molina,* 934 F.2d 1440, 1451 (9th Cir.1991) ("negotiated amount" not charged to a defendant who "did not intend to produce, *or* who was not reasonably capable of producing" such amount) (emphasis added); *Ruiz,* 932 F.2d at 1183–84 (amount included if defendant "intended to produce and was 'reasonably capable of producing'" quantity of drugs).[8]

■ Though designed to remedy the problems posed by "puffing," the first Application Note's third sentence has thus en-

meshed the base offense determination in quandaries of form to the exclusion of substance. Extrapolating from basic statutory construction principles, this court may, and indeed, must, look beyond the first Application Note's literal terms where "slavish adherence" to such language would subvert the purpose of the very Sentencing Guideline it seeks to explicate. *See Grand Light & Supply Co. v. Honeywell, Inc.,* 771 F.2d 672, 677 (2d Cir.1985) ("[w]here the result of a literal interpretation of statutory language is absurd, or where the obvious purpose of the statute is thwarted by slavish adherence to its terms, we may look beyond the plain language") (citation omitted); *Bob Jones Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983) ("[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute"); *Viacom Int'l, Inc. v. FCC,* 672 F.2d 1034, 1039 (2d Cir.1982) ("the surest way to misinterpret a statute or a rule is to follow its literal language without reference to its purpose"). *See also Kelly v. Wauconda Park Dist.,* 801 F.2d 269, 270 n. 1 (7th Cir.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987) (courts must not "rely too heavily on characterizations such as 'disjunctive' form versus 'conjunctive' form to resolve difficult issues of statutory construction," but instead must "look at all parts of the statute").

By requiring punishment regardless of the defendant's *intent* to produce contested amounts, the literal language of Application Note 1 obfuscates the purpose of former Sentencing Guideline § 2D1.4—punishing the object of the conspiracy. To the extent this language suggests that setting the base offense level is a task distinct from determining the intent of the defendant who supposedly negotiated the agreement, it undermines this purpose.

Therefore, despite our suggestion to the contrary in *Howard,* we do not, at least in a conspiracy case, require sentencing courts to

---

8. At least one court, though expressly refusing to decide the burden of proof issue, has examined, we believe correctly, whether the evidence demonstrated an agreement to produce the amount at issue. *United States v. Smiley,* 997 F.2d 475, 481 (8th Cir.1993).

exclude from consideration only those drug amounts which the defendant neither intended to produce nor was reasonably capable of producing. Instead, we shift the Sentencing Guideline § 2D1.4 analysis back to its proper focus—the "object of the conspiracy." In other words, courts must consider the amount of drugs the conspirators agreed to produce. Because this amount defines the base offense level, we hold that the Government bears the burden of proving the defendant's intent to produce the contested quantity of narcotics under former Sentencing Guideline § 2D1.4. As noted previously, where the Government relies upon the agreement of other co-conspirators to establish the base offense level, then the inquiry shifts to the relevant conduct inquiry of Sentencing Guideline § 1B1.3.

We now address the considerations that should guide the sentencing court in its evaluation of whether the Government has satisfied its burden under former Sentencing Guideline § 2D1.4.

### 2. *Proving the Object of the Conspiracy*

As stated above, the defendant's ability, which includes that of his co-conspirators, to produce specific amounts of narcotics, is highly relevant in determining whether the conspirators *agreed* to produce these amounts. Providing substance to wishes, ability often transforms the desire to produce narcotics into intent sufficient to form an agreement to do so; indeed, ability operates much like the overt act required for conspiracies other than drug conspiracies, in that it provides additional proof that an agreement existed.[9] *See United States v. Brown,* 985 F.2d 766, 768 (5th Cir.1993) (defendants were "reasonably capable" of producing contested amounts since their negotiations to obtain drugs and repeated attempts to arrange financing alternatives demonstrated they clearly "intended to possess the marijuana"); *United States v. Fowler,* 990 F.2d 1005, 1006 (7th Cir.1993) (defendant's past drug deals and financing scheme for purchasing contested amount demonstrated that his "claims

about his ability to buy the marijuana amount[ed] to more than idle boasts"). However, where ability is lacking, talk about selling or supplying narcotics often remains just that—talk. For this reason, where neither the defendant nor the defendant's co-conspirators had a plan for acquiring, the means of obtaining, or access to disputed quantities of drugs, it is hard to imagine that the conspirators actually agreed to produce these amounts.

■ Thus, an assessment of the reasons why the conspiracy never yielded the contested amounts is highly relevant to a court's analysis of whether the conspirators agreed to produce such amounts. We emphasize, however, that inability due to frustrated efforts, factual impossibilities or unforeseen circumstances does not defeat the inference of an agreement to produce contested amounts of narcotics. As our prior decisions addressing "reasonable capability" sentencing challenges demonstrate, the failure to produce is relevant only to the extent it suggests an absence of intent or agreement. For example, in *Howard,* we rejected the defendant's argument that he was not "reasonably capable" of producing the three kilograms of cocaine he planned to steal, because there was no cocaine in the apartment he broke into. That it was factually impossible to produce the drugs was irrelevant; the "reasonable capability" analysis "looks to whether a defendant would have been able to consummate a narcotics transaction if the facts were as he believed them to be." 998 F.2d at 51. The defendant's plans to steal the drugs left the realm of wishful thinking when he "obtained a key and the tools necessary to carry [them] out." *Id.* Thus, the absence of the drugs, not the lack of intent or an agreement among the co-conspirators, precluded the defendant from realizing his plan. *Id.* *See also United States v. Beaulieau,* 959 F.2d 375, 379 (2d Cir.1992) (inability to produce drugs at the requested time did not vitiate the defendant's intent to produce the narcotics); *United States v. Pimentel,* 932 F.2d 1029, 1031 (2d Cir.1991) (defen-

---

9. *See* 21 U.S.C. § 846 (1990); *United States v. Bermudez,* 526 F.2d 89 (2d Cir.1975) (overt act not required for drug conspiracy convictions), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

dants' arrest, not their lack of intent, precluded them from producing the contested amounts).

While important, a defendant's ability to produce specified quantities is not dispositive of the issue of his or her agreement to produce such amounts; as we noted earlier, former Sentencing Guideline § 2D1.4 was not designed to punish mere opportunity. Therefore, the defendant's ability to produce contested amounts is irrelevant in the absence of evidence that the defendant agreed with a liable co-conspirator (i.e. not a government agent) to draw upon this ability to further the purported transactions. *Cf. United States v. Foley*, 906 F.2d 1261, 1264 (8th Cir.1990) ("without some evidence of knowing participation" in purported transaction defendant's mere mention of price of two ounces of cocaine insufficient to establish that defendant agreed to supply that amount despite her access to such amounts); *Beaulieau*, 959 F.2d at 379 (defendant's intent demonstrated by his relationship with a supplier and efforts to obtain the contested amounts from this source).

■ In addition, in discerning the conspiracy's object, the court must examine the defendant's conduct and statements, as well as that of his co-conspirators, throughout the course of the conspiracy, and not limit the analysis to preliminary discussions. *See United States v. Moon*, 926 F.2d 204, 209–10 (2d Cir.1991) (sentence based on two kilograms of cocaine vacated despite the defendant's "early conversations" about the price and availability of such amount where the bulk of defendant's actions and statements revealed an intent to produce one kilogram). Hence, courts must consider all discussions concerning the narcotics transaction, and de-

termine whether such conversations were sufficiently specific as to price, delivery, financing, and other logistics to suggest a firm agreement to produce specific amounts, as opposed to mere exploratory discussions about such quantities. *See Ruiz*, 932 F.2d at 1184 (defendant's single comment, "even ten more I can get," was "hardly the negotiation of a specific drug transaction"). However, sentencing courts must not simply end the analysis at the discussion stage, but must further examine whether the defendant and his co-conspirators took any action toward producing the contested amounts, such as seeking financing, making arrangements for delivering the drugs, or contacting suppliers to procure such narcotics. *See Pimentel*, 932 F.2d at 1031; *Fowler*, 990 F.2d at 1007.[10]

In short, in determining whether the Government has met its burden, the sentencing court must consider all factors which inform the conspiratorial agreement to produce a specific amount, and evaluate whether a preponderance of reliable evidence demonstrates that the defendant and a culpable co-conspirator *intended*, to produce such an amount. *See* Sentencing Guideline § 6A1.3 (1993) (finding of fact at sentencing hearing must be based on reliable evidence).

### 3. *The District Court's Findings*

■ We review a district court's factual finding regarding the quantity of drugs involved for clear error. *United States v. Howard*, 998 F.2d 42, 51 (2d Cir.1993); *United States v. Olvera*, 954 F.2d 788, 791 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992); *see also* 18 U.S.C. § 3742(e) (1993 Supp.) (reviewing court must "accept the findings of fact of the

---

10. The dissent argues that "evidence of a negotiated quantity is prima facie evidence of intent and capability." However, it is not just any evidence, but rather a preponderance of the evidence—to be demonstrated by the Government—that must support a proffered negotiated amount. Without question, in most cases, "negotiations [will be] reliable admissions as to a [defendant's] intentions with regard to quantities intended to flow from the conspiracy," and evidence of such negotiations will often outweigh any post-conviction claims that the defendant lacked either the intent or the ability to produce the contested amount. However, where as here, the thrust,

tenor and substance of the very negotiations at issue suggest a lack of intent and an inability to produce the contested amount of narcotics, the district court may not predicate sentencing on isolated, passing or preliminary discussions, but must examine the negotiations, and the parties' course of conduct, in their entirety. Contrary to the dissent's view, this imposes no additional or heightened burden on district courts; indeed, it is, and has always been, the essence of the court's obligation at the sentencing stage to ensure that amount which determined the base offense level be established by a preponderance of the evidence.

district court unless they are clearly errone-ous"); *United States v. Castagnet*, 936 F.2d 57, 59 (2d Cir.1991) (a district court's application of the Sentencing Guidelines to findings of fact is reviewable under clearly erroneous standard"). Only when we are left with "the definite and firm conviction that a mistake has been committed," will we disturb a trial judge's findings of fact. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ However, despite our narrow scope of review, we require sentencing courts to make clear and specific findings regarding the amount of narcotics involved in a drug conspiracy, adequately stating the reasons for their conclusions. *United States v. Maturo*, 982 F.2d 57 (2d Cir.1992) (remanding case for additional sentencing proceedings where district court failed to make "specific affirmative factual findings" regarding the amount of narcotics involved), *cert. denied*, —— U.S. ——, 113 S.Ct. 2982, 125 L.Ed.2d 679 (1993); *see also United States v. Jacobo*, 934 F.2d 411, 416 (2d Cir.1991) (sentencing court required to make its own factual determinations as to quantity of drugs involved); *United States v. Palta*, 880 F.2d 636, 641 (2d Cir.1989) (sentencing court "shall clearly state its resolution of any disputed factors predicated upon its findings"); 18 U.S.C. § 3553(c)(1) (1988 & Supp.1993) (court shall state the reasons for its imposition of a particular sentence).

■ Here, the district court based its finding that Hendrickson's agreed with co-conspirators to produce 50 or 60 kilograms of heroin on Hendrickson's initial conversations with York regarding his proposed importation scheme. Specifically, Judge Johnson stated:

I also heard the conversations concerning 50, 60 kilograms of heroin.

I also heard conversations between the defendant and the informant where the

defendant was willing to purchase, lease or rent an airplane to travel from the United States to Nigeria to pick up heroin, and I take that—you are not going to rent an airplane to travel that length to purchase three ounces or one kilo, and that lends some credence to the conversation that it was the intent of the defendant to bring in 50, 60 or maybe even more kilos.

So I think as a finding of fact that the government has substantiated its claim that at least 50, 60 kilograms of heroin was the subject of the conspiracy.

Tr., at 22. The district court summarily dismissed Hendrickson's argument that he lacked the ability to import these amounts,[11] simply remarking, "I think that he was capable of doing it." Tr. at 24.

The district court never addressed Hendrickson's repeated statements throughout his conversations with York that his Nigerian contacts had not dealt with him before on a project as large as his proposed Nigerian importation deal. Nor did the district court mention Hendrickson's later admissions during the course of the undercover investigation that his contacts were satisfied with their mules and not interested in his Nigerian importation plan. Thus, the district court never articulated how it reached the conclusion that Hendrickson had agreed with someone other than York, a government informant, to produce the 50–60 kilograms that it deemed to be the object of the conspiracy.

■ We recognize that the trial judge is in the best position to evaluate the credibility of the witnesses and the evidence presented, and that appellate courts should not lightly disturb such evaluations. *United States v. Beverly*, 5 F.3d 633 (2d Cir.1993); *see United States v. Maldonado–Rivera*, 922 F.2d 934, 973 (2d Cir.1990). Here, however, the totality of the evidence strongly suggests that Hendrickson was a drug dealer who may have dreamed of importing millions of dollars worth of heroin from Nigeria, but certainly

---

**11.** At sentencing, the parties did not dispute that Hendrickson sold York a total of 77 grams of heroin. The disagreement centered on whether 50–60 kilograms of heroin was the amount the conspirators agreed to produce. Both defense counsel and the Assistant United States Attorney, without explaining the basis for their calculation, acknowledged at sentencing that at least one to three kilograms of heroin was the minimum amount Hendrickson intended to produce. We take no position on what the parties might argue, or what the district court might conclude, at resentencing concerning what the conspirators agreed to produce.

neither intended nor agreed with anyone other than York to do so.[12]

To be sure, Hendrickson knew drug dealers, among them Balogun and Uchannaya, who may have had access to large quantities of heroin; however, there is no indication that they or any other Nigerian dealers were more than "receptive" to Hendrickson's proposed scheme. During his initial conversations with York, Hendrickson made clear the tentative nature of his Nigerian project, telling York that he needed to devise a concrete, well-researched plan before he could convince his Nigerian contacts to agree to the plan. Apparently, given Hendrickson's repeated statements that the Nigerian contacts believed him a small-time dealer and deemed his proposed importation idea unworthy of consideration, they were never convinced.[13]

Tellingly, after the two initial conversations about the Nigeria plan, it was York, not the defendant, who inquired about and continually expressed a desire to proceed with the purported Nigerian deal. During the remaining 18 months of the investigation, Hendrickson directed his efforts towards securing small quantities of heroin to sell to York, and developing his heroin operations in Bermuda.

Indeed, the fact that Hendrickson was able to produce, with great difficulty, only 77 grams of heroin over the course of almost two years makes his alleged conspiratorial agreement with someone besides York to supply 50 or 60 kilograms of heroin doubtful, at best. Notwithstanding the meager amount of heroin Hendrickson actually produced, the Government, citing our decision in *United States v. Olvera,* 954 F.2d 788, 792 (2d Cir.1992), argues that the high purity of these drugs implies the existence of a conspiratorial agreement to produce large quantities of narcotics. As an initial matter, the origin of the drug samples Hendrickson produced to York is unclear; the record before us does not indicate whether the samples were obtained from Hendrickson's Nigerian sources or his Bermuda operations. More importantly, unlike the defendants in *Olvera,* Hendrickson disclaimed the existence of an agreement to produce 50 or 60 kilograms of heroin during the undercover investigation, not just after his arrest. Where, post arrest, a defendant denies that he or she agreed to produce a particular amount of narcotics, high purity drugs actually produced by the defendant or seized from him or her may provide strong evidence that an agreement to produce larger amounts existed. *See id.*

12. Although Hendrickson's brother Mark was present at Hendrickson's first meeting with York, and at one point during the meeting asked York if he was going to be their "pilot," there is no evidence that Mark was involved in any subsequent discussions about the proposed Nigerian importation scheme or took any action in furtherance of the scheme.

Aside from Mark, the evidence reveals only two other co-conspirators, Balogun and Uchannaya, who were even aware of Hendrickson's Nigerian importation scheme. Uchannaya discussed the Nigerian importation idea with Hendrickson and York on August 10, 1989, and expressed his desire for alternate means of importing heroin from Nigeria, but nothing in the record suggests that he ever agreed to Hendrickson's plan. As for Balogun, there is no evidence that he ever expressed interest in Hendrickson's plan. In fact, the evidence reveals that York's attempt apparently to spark Balogun's interest in the plan made Balogun extremely nervous, and according to Hendrickson, frustrated his efforts to arrange "something big."

As for Hendrickson's other potential co-conspirators, the only drug deals or projects as to which there is any evidence of their involvement are Hendrickson's sales of heroin to York, his Bermuda operations and his proposed Bermuda distribution network. The evidence reveals that Catalano, and perhaps, Mark, were involved in Hendrickson's Bermuda activities and projects. Yet, it is not clear from the sentencing court's findings who, other than York, had agreed with Hendrickson to pursue the Nigerian importation idea.

Clearly, a conspiratorial agreement to produce narcotics can be formed between any two participants in a drug operation, be they suppliers, distributors or manufacturers. To base Hendrickson's sentence on 50–60 kilograms of heroin, the sentencing court must find an agreement to produce such amount between Hendrickson and at least one other culpable co-conspirator. The district court's findings, however, are silent as to who, other than York, Hendrickson conspired with to produce 50–60 kilograms of heroin.

13. Nor apparently was Uchannaya, who once expressed interest in Hendrickson's Nigerian plan. After York failed to complete a small drug transaction with Uchannaya, Hendrickson told York that York's inability to go through with the transaction had severely strained Hendrickson's credibility with Uchannaya.

(high purity of narcotics seized supported sentencing court's finding that the defendants agreed to distribute 5 kilograms of cocaine for it "showed that they were not low-level traffickers"). However, standing alone, high purity drugs or access to suppliers do not provide sufficient grounds to infer the existence of a conspiratorial agreement to supply specified quantities of narcotics where, as here, during the course of an undercover investigation, the defendant admits that such an agreement never existed. While there may be other evidence suggesting the existence of a conspiratorial agreement to produce 50 or 60 kilograms of heroin, the evidence in the limited record before us does not support that conclusion.[14]

Consequently, on the record before us, Hendrickson's argument is compelling that his initial discussions with York about importing 50–60 kilograms of heroin from Nigeria, without more, do not establish a conspiratorial agreement between Hendrickson and a culpable co-conspirator to import such amounts. The district court noted Hendrickson's initial conversations with York, but failed to explain how Hendrickson's desire to import huge quantities of heroin from Nigeria as expressed in these discussions translated into an agreement with others beside York to do so. Nevertheless, on the basis of extremely sparse findings, the district court calculated the base offense level using amounts that had the effect of increasing the defendant's sentence to life imprisonment.

We can not countenance a life sentence in this case or any other without more extensive and detailed factual findings by the sentencing court. A sentencing court must be more searching in its inquiry, and more specific in its findings than the district court was here; at the very least, a district court should exercise care in addressing the arguments raised by the defendant at sentencing. *Cf. United States v. Concepcion*, 983 F.2d 369, 390 (2d Cir.1992) (recognizing that other courts have required clear and convincing evidence to support extraordinary sentencing enhancements, although noting that the Sec-

ond Circuit appears to have accepted a preponderance of the evidence standard). To justify its sentence of life imprisonment, the district court must clearly articulate its reasons as to why exploratory discussions about a plan that never materialized, in the face of Hendrickson repeated disavowals of an agreement during the course of the conspiracy, demonstrate a conspiratorial agreement to import 50–60 kilograms of heroin.

We, therefore, remand for re-sentencing on two grounds. First, we believe that the district court may have, on the basis of the Government's argument that the defendant bore the burden of proving lack of intent and capability, improperly assigned to the defendant the burden of disproving the object of the conspiracy, in other words, the conspiratorial agreement to produce 50–60 kilograms of heroin. Second, we find that the district court's failure to "clearly state its resolution of any disputed factors predicated upon its findings," has precluded appropriate appellate review pursuant to 18 U.S.C. § 3742. *Palta*, 880 F.2d at 641.

On remand, the sentencing court should set forth in greater detail the evidence that supports its finding of the amount agreed upon, explaining why contrary evidence is not persuasive. Specifically, the court must examine Hendrickson's statements and actions throughout the course of the undercover investigation, and explain why Hendrickson's repeated pre-arrest disavowals of an agreement to import 50–60 kilograms of heroin from Nigeria and his inability to produce more than 77 grams of heroin do not negate whatever inference of intent that might be drawn from his initial conversations with York. The court must also identify the culpable co-conspirator[s] with whom Hendrickson agreed to produce 50–60 kilograms of heroin, and set forth the basis for its conclusion that such individual[s] participated in this conspiracy as opposed to those relating to Hendrickson's Bermuda operations or his sales of heroin to York.

---

14. The record on appeal includes only transcripts of the wiretapped or video-recorded conversations between York, Hendrickson and the other conspirators, the sentencing hearing transcript, and various transcripts from pre-trial hearings. However, the actual trial transcripts is not included.

## B. *The Speedy Trial Act Motion*

■■■ We find Hendrickson's Speedy Trial Act arguments utterly without merit. Section 3161(h)(1)(F) of the Speedy Trial Act excludes from Speedy Trial Act calculations "all time between the filing of a motion and the conclusion of a hearing on that motion, whether or not a delay in holding that hearing was 'reasonably necessary'". *Henderson v. United States,* 476 U.S. 321, 330, 106 S.Ct. 1871, 1877, 90 L.Ed.2d 299 (1986). Hendrickson nevertheless contends that the district court improperly excluded two time periods—from September 13, 1991 to November 5, 1991, and from January 13, 1992 to February 19, 1992—because the motions pending during those periods "required virtually no time at all to decide."

We are hard pressed to understand how Hendrickson's argument is outside the scope of the holding in *Henderson.* In any event, the motion pending during the first time period was a motion to reconsider Judge Raggi's earlier ruling permitting the use at trial of two tapes Hendrickson claimed had been tampered with by York. Though he now asserts that this motion required little consideration, defense counsel told Judge Johnson at the September 13 conference that an evidentiary hearing might be necessary to decide the motion. Thus, it is extremely disingenuous for Hendrickson to now claim that this motion required "no time" to decide.

Similarly, Hendrickson's motion for severance was filed during the second period of delay in the trial. There is no good faith basis for Hendrickson to argue that the month's time taken by Judge Johnson to hear and decide this motion, even a purportedly simple motion, was unreasonable.

Thus, we agree with Judge Johnson that Hendrickson can not "have it both ways" by filing pretrial motions that interrupted the speedy trial calculations, and then complaining that the district court did not decide them expeditiously. Therefore, we hold that the district court properly excluded the two contested time periods from the speedy trial period and affirm Hendrickson's conviction.

## V. CONCLUSION

For the foregoing reasons, the judgment of conviction is affirmed, the sentence vacated, and the matter remanded for additional sentencing proceedings in accordance with this opinion.

WINTER, Circuit Judge, concurring in part and dissenting in part:

I concur in the affirmance of the conviction. I dissent from the remand for resentencing. I do not agree that Application Note 1 is inconsistent with former United States Sentencing Commission, *Guidelines Manual,* § 2D1.4 (Nov.1991). Application Note 1 provides sensible evidentiary guidance to determine for sentencing purposes the applicable quantity in cases in which negotiations occur but a buy does not result. There is nothing invalid in such guidance, and I cannot agree with my colleagues that, to prove the applicable quantity for sentencing purposes, the government must show more than the quantity under negotiation and an intent or capability to produce that quantity. In particular, I do not agree that the government must identify particular co-conspirators as having agreed to supply the precise negotiated amount. I believe, however, that under Application Note 1 the government must prove intent or capability to produce the negotiated amount once intent and capability are put in issue. In the instant matter, Hendrickson's intent to import 50 kilograms of heroin was established by overwhelming evidence.

I

Former U.S.S.G. § 2D1.4 provided in pertinent part: "If a defendant is convicted of a conspiracy ... to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy ... had been completed." The relevant statutes require only that the jury find that the conspirators agreed to possess with intent to distribute a quantity in excess of designated minimum amounts. 21 U.S.C. §§ 841(b)(1)(A)(i), 846 (1988). The jury is not asked to identify precise amounts in excess of those minimum amounts. *United States v. Campuzano,* 905 F.2d 677, 679 (2d

Cir.), *cert. denied,* 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990). Before sentencing, therefore, "the object of the conspiracy" found by the jury will be a quantity that is undetermined except that it is greater than a designated minimum.

A determination of the precise quantity of narcotics involved is thus relevant only for sentencing purposes, in particular to determine the base offense level. *United States v. Moore,* 968 F.2d 216, 224 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 480, 121 L.Ed.2d 385 (1992); *United States v. Madkour,* 930 F.2d 234, 237 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 308, 116 L.Ed.2d 251 (1991).

Application Note 1 deals with that determination in cases where negotiations have occurred but a distribution has not taken place. It provides in pertinent part:

> If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

Application Note 1 thus indicates that the quantity under negotiation as reflected in the evidence at trial should determine the base offense level for sentencing purposes, subject to the intent and capability qualification. We are instructed by the Supreme Court to treat commentary to the Guidelines as an agency interpretation of its own regulations. Application Note 1 is therefore binding upon us unless plainly erroneous or inconsistent with former Section 2D1.4. *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993).

Application Note 1 is clearly valid under that test. It suggests nothing that is not dictated by common sense. Based entirely or in part on the evidence of the negotiations, the jury has already convicted the defendant of a conspiracy to distribute controlled substances in quantities in excess of the designated minimum. For sentencing purposes, the negotiations may be presumed to reflect the defendant's intentions regarding quantities and thus the degree of his or her culpability. However, to protect defendants who may be engaged in what the Commentary to the pertinent provisions calls "puffing," United States Sentencing Commission, *Guidelines Manual* app. C, amd. 136 (Nov.1991), Application Note 1 states that where the defendant's intent and capability to produce the negotiated quantity is negated (more on the burden of proof *infra*), the quantity negotiated loses its presumptive weight.

My colleagues decline to follow the common sense guidance of Application Note 1, find it inconsistent with former Section 2D1.4, and hold that the government must prove a specific agreement among particular conspirators to provide the precise quantity that determines the base offense level.[1] In their view, negotiations alone do not suffice to prove the relevant quantity, and the government must show at sentencing either "a plan for acquiring, the means of obtaining, or access to disputed quantities of drugs" among the conspirators. However, it is not enough to show even that a defendant who has negotiated a particular quantity is actual-

---

1. My colleagues' decision is somewhat ambiguous as to whether they believe that there was no proof of *anyone* conspiring with Hendrickson to distribute 50 kilograms or no proof of a specific conspiratorial agreement between Hendrickson and a *supplier* with regard to the negotiated amount. Certainly, there is evidence that Mark Hendrickson conspired with appellant with regard to 50 kilograms, or so the district court could have found. Mark was present at the initial conversation with York. This was no chance meeting but occurred by appointment for the specific purpose of arranging transportation for the drug deal. Mark participated in the conversation on at least three occasions and, significantly, referred to York as "our pilot." I do not belabor this point because the logic of my colleagues' position as reflected in the quotations in the text following this note is that the requisite co-conspirator must in the present circumstances be a supplier rather than a distributor. For example, finding that Mark was a co-conspirator would not show "a plan for acquiring, the means of obtaining, or access to" drugs or "action toward producing the contested amounts."

ly able to produce that quantity because "a defendant's ability to produce specified quantities is not dispositive of the issue of his or her agreement to produce such amounts." Rather, "sentencing courts must not simply end the analysis at the discussion stage, but must further examine whether the defendant and his co-conspirators took any action toward producing the contested amounts, such as seeking financing, making arrangements for delivering the drugs, or contacting suppliers to procure such narcotics." Because negotiations over a particular amount together with a capability to produce the amount negotiated are not enough in my colleagues' view to prove that the quantity negotiated was a goal of the already proven conspiracy, the government's burden at sentencing is heavy indeed, and, in many cases perhaps insurmountable. It is in the nature of uncompleted buys that some details will be lacking, particularly where foreign suppliers are involved. To hold, as my colleagues do, that negotiations are of little weight in determining the applicable quantity for sentencing purposes will unnecessarily allow defendants who are by common sense standards highly culpable to escape well-deserved sentences.

What is distressingly wrong with my colleagues' position is that it ignores that a conviction for conspiracy has already been rendered and that negotiations viewed against the background of that conviction are highly reliable evidence of a convicted defendant's intentions with regard to the distribution of particular quantities of narcotics. The conviction ensures that the conspiracy existed and that the negotiations were in furtherance of it. The negotiations are direct admissions by the defendant as to his intentions with regard to the quantities intended to flow from the conspiracy's activities. Such admissions ought to be determinative of such quantities for sentencing purposes absent evidence, as Application Note 1 provides in the conjunctive,[2] *United States v. Howard,* 998 F.2d 42, 50–51 (2d Cir.1993), that the defendant neither intended nor had the capability to produce such quantities. My colleagues reject this common sense approach by failing to take into account the fact that Hendrickson has been convicted. Indeed, much of the caselaw relied upon for placing this burden on the government at sentencing are not sentencing cases at all but rather decisions relating to the sufficiency of the evidence of the crime of conspiracy, an issue settled before sentencing.

Notably, Hendrickson does not challenge the sufficiency of the evidence underlying his conviction. Hendrickson thus had been adjudicated to be a member of a narcotics conspiracy, and it was not necessary for Judge Johnson to make any further findings regarding the existence of that conspiracy or the identity of the conspirators at sentencing. What the judge had to find was the quantity of narcotics Hendrickson intended to import as reflected in his negotiations with York or in other transactions. If at any time Hendrickson intended to import 50 kilograms, then the base offense level was correctly determined.

## II

With regard to the burden of proof as to intent and capability under Application Note 1, I am at a loss as to why my colleagues even address the question. If Application Note 1 is inconsistent with Guidelines Section 2D1.4, and the government must prove at sentencing that particular co-conspirators agreed to produce the particular quantity in question, no burden of proof arises with regard to Application Note 1's qualification concerning intent and capability.

Because I do not agree that Application Note 1 is invalid, I will briefly address the burden of proof issue. It might well have been sensible for the Sentencing Commission to impose the burden of showing the lack of intent and capability on the defendant. The defendant is surely in a superior position to produce evidence concerning the absence of those factors. However, the Sentencing Guidelines purport to be a comprehensive code, and courts should be reluctant to adopt a rule shifting the burden of proof absent

---

**2.** The requirement that both intent and capability be lacking stems from the Commission's purpose to mitigate for "puffing." A defendant who either intends or is capable of producing the negotiated amount is not "puffing" but is culpable for that amount.

some support in the text. I would, therefore, agree that intent and capability must be shown by the government. However, I also believe that evidence.of a negotiated quantity is *prima facie* evidence of intent and capability and that, assuming evidence already in the record does not raise a doubt as to those matters, the defendant must bear the burden of producing evidence that puts the matter in issue, although the ultimate burden of persuasion remains with the government.

### III

With regard to the facts in the instant matter, Hendrickson was an international narcotics dealer with contacts in Nigeria, Bermuda, Thailand, and the United States. Hendrickson sold samples of high-purity heroin to government informants and planned to buy a speedboat to be used in smuggling narcotics. Hendrickson conspired in the narcotics dealing activity of several other individuals, among them Sunday Phillips, Balogun (whom he introduced to York), Uchannaya (whom he also introduced to York), a man named "Tony," and his own brother, Mark Hendrickson. My colleagues stress that Hendrickson did not produce more than 77 grams of heroin in his dealings with York. Tellingly, however, Hendrickson indicated that one planned sale to York failed because a courier had been arrested. This arrest is confirmed in the record.

Hendrickson's negotiations with York, other government informants, and Hendrickson's brother Mark, demonstrated his knowledge of the details of international narcotics smuggling. Hendrickson identified himself as "a veteran in the business" of multi-kilogram heroin smuggling, and explained his expertise by stating, "I've spent the time and the energy and the research and trial and error so I know what it take[s] and how to cut it too."

The plan to import narcotics by private plane from Nigeria was only one of many operations in which Hendrickson was involved. Hendrickson was already part of an "ongoing operation [that] holds about one a week," i.e., a conspiracy to import heroin in weekly one-kilogram loads. However, Hendrickson expressed frustration with this arrangement because of its gradual nature and affirmed his intention to "Go big and that's it." Hendrickson thus repeatedly emphasized the desirability of importing a large amount of heroin in a single trip and his ability to arrange for such a shipment.

Turning specifically to the plan to import 50 to 60 kilograms from Nigeria, Hendrickson sought out York because he was a pilot who was believed to be willing to fly a large shipment of heroin from a source location to the United States. In their first conversation, Hendrickson discussed the logistics of transporting more than 50 kilograms of heroin by plane, analyzing specifications for an appropriate aircraft, the best route, and the location of refueling stops. He negotiated a price for York's transporting the heroin and discussed the financing at length, referring to his experience with banking arrangements in his ongoing importation conspiracy in Bermuda. It should be emphasized that Hendrickson did not seek out York as a purchaser but as a pilot. If Hendrickson did not intend to carry out the Nigerian deal, there was no reason to contact York.

At no time in the initial conversation did Hendrickson express misgivings or doubts about the 50 kilogram deal. He said he had "a standing invitation" in Nigeria and suggested that his Nigerian contact might well want to transport more than 50 kilograms.[3] He reassured York that "I have people who,

---

3. I do not agree with my colleagues' interpretative gloss that, in his first conversation with York, Hendrickson suggested everything was tentative. It is true that Hendrickson said that his Nigerian contact was "not used to this kind of international thing." However, in that regard the transcript reads as follows:

> Hendrickson: You see, when I go to him, he's not used to this kind of international thing, all right? When I go to him and I tell him about what I have you understand?
> York: Yeah.
> Hendrickson: He's going to right off, if I want fifty for myself, he gonna' wonna' as I figure he will want to put another fifty or sixty for himself.

Also, the stated need for the Nigerian to "verify" something was an observation that the contact would want to meet with York.

who will put up the money up front whatever you want" and ended the conversation by agreeing with York that "we have our deal."

At all subsequent times and notwithstanding difficulties, Hendrickson remained committed to the 50 kilogram scheme. Describing a conversation with the Nigerian contact, Hendrickson stated, "I told him what I wanted.... I wanted fifty [kilograms of heroin] and he said that's no problem." Questions later arose about the timing of the Nigerian deal, but Hendrickson's commitment remained firm, although he did not view the Nigerian scheme as excluding smaller narcotics deals. Even after expressing his concern that "[y]ou have to build for" a 50-kilogram operation, Hendrickson insisted that "everything is set" and, referring to a recent trip to Nigeria, stated, "I'm saying it's green light, and that's that. I've been there. All the plans are made. I've seen the operation, know where it's gonna go, everything."

By any common sense standard, Hendrickson's own words overwhelmingly reflect his intention to import 50 to 60 kilograms of heroin. He was already an experienced international narcotics smuggler who was looking for a big kill. His very contacting of York and statements in the first conversation alone demonstrate his intent beyond any reasonable dispute. Difficulties were encountered—perhaps because Balogun developed suspicions concerning York—but the existence of that intent at any point during the conspiracy period is sufficient to establish 50 kilograms as the applicable quantity regardless of later events. *See Howard* at 51. (In my view, Hendrickson intended to carry out the 50 kilogram deal up to his arrest. His concessions of difficulties were generally accompanied by statements of his intent to pursue the deal.) Hendrickson's capability to carry out the deal is a closer issue, because it was contingent upon other factors. However, under Application Note 1, intent alone suffices to establish the applicable quantity. *See* Note 2, *supra*, and accompanying text.

Therefore, I would not remand. The district judge gave no indication that he believed Hendrickson bore the burden of proof on any issue, and his findings, specifically based on the face value of Hendrickson's statements, were not clearly erroneous. In fact, they were entirely correct. I would affirm the conviction and the sentence.