UNITED STATES of America,
Appellee,

v.

Richard A. DALLAS, Defendant–
Appellant.

No. 00–1176.

United States Court of Appeals,
Second Circuit.

Argued: Aug. 29, 2000

Decided: Oct. 4, 2000

Elizabeth D. Mann, Asst. Federal Public Defender, Burlington, VT (Alexander Bunin, Federal Public Defender, Burlington, VT, on the brief), for defendant-appellant.

David V. Kirby, Asst. U.S. Atty., Chief, Criminal Div., Burlington, VT (Charles R. Tetzlaff, U.S. Atty., Gary G. Shattuck, Asst. U.S. Atty., Burlington, VT, on the brief), for appellee.

Before: NEWMAN, WINTER, and SACK, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the amount of narcotics to be counted in sentencing for a conspiracy offense where a portion of the quantity the defendant planned to sell was not narcotics. Specifically, the issue is whether a defendant who agreed to sell an additional six ounces of cocaine after two prior sales should have the six ounces included in his sentencing calculation even though he later decided to substitute flour for cocaine. Defendant–Appellant Richard A. Dallas appeals from the March 1, 2000,

judgment of the United States District Court for the District of Vermont (J. Garvan Murtha, Chief Judge), sentencing him to 33 months after he pled guilty to conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (1994). We conclude that the conspiratorial agreement to sell narcotics included the disputed six ounces of cocaine, notwithstanding the Defendant's decision to substitute flour for cocaine before the six-ounce sale was made. We therefore affirm.

## Facts

The essential facts are undisputed. In the summer of 1999, Dallas and his girlfriend Rebecca Heyward were engaged in a conspiracy to distribute narcotics. When a prospective buyer was identified, Heyward would try to obtain narcotics from her source. In May, Dallas agreed to sell an ounce of cocaine to a confidential informant ("CI"), but the sale did not occur at that time because the source could not supply the drugs on short notice. On July 23, 1999, Dallas and Heyward traveled from Massachusetts to Vermont, and sold an ounce of cocaine to the CI, along with six small packages of heroin included as a bonus.

In a telephone conversation a few days later, Dallas agreed to sell the CI three ounces of cocaine for $3,000, and twenty bags of heroin for $400. This second sale occurred on July 30; to resolve a disagreement about the price of the heroin, Dallas gave the CI, in addition to the cocaine, twenty-two bags of heroin rather than the twenty they had negotiated.

On August 6, 1999, Dallas agreed to sell the CI six more ounces of cocaine and 40 bags of heroin. Heyward attempted to get the narcotics for the third sale from her source, but was unable to do so. She then decided to substitute six ounces of flour for the cocaine.[1] Dallas contends, and the Government does not dispute, that Dallas was aware of the substitution. On the

evening of August 6, Dallas and Heyward began traveling to Vermont with the six ounces of flour. Police arrested them on the highway before their scheduled meeting with the CI and in their car found two packages containing the flour.

Dallas pled guilty to a one-count information charging him with conspiring to distribute controlled substances between July 23 and August 6, 1999. The Presentence Report attributed 288.32 grams of cocaine to the defendant: 28.35 grams from the July 23 one-ounce sale, 84.97 grams from the July 30 three-ounce sale, 170 grams for the six ounces of cocaine he agreed to supply on August 6, and five grams of cocaine, which was the converted equivalent of the heroin sold during the first two transactions. Dallas challenged the inclusion of the six ounces of cocaine.

Chief Judge Murtha rejected Dallas's challenge, finding that Dallas intended to deliver and was reasonably capable of producing the six ounces of cocaine. Because Dallas was involved with between 200 and 300 grams of cocaine (including the six ounces), his base offense level was 20, resulting in a total offense level of 19 after adjustments. The District Judge imposed a sentence that included 33 months' imprisonment, the bottom of the range for a defendant in Criminal History Category II.

## Discussion

In its zeal to calibrate narcotics punishments precisely with the quantity of narcotics involved in an offense, the Sentencing Commission has specified seventeen different categories of quantities, correlating each with a different base offense level. See U.S.S.G. § 2D1.1(c) (drug quantity table). This approach, which has been characterized as reflecting a notion of "incremental immorality," see *United States v. Martinez–Rios*, 143 F.3d 662, 670 (2d Cir. 1998), assumes, for example, that a defen-

---

1. The record is unclear as to whether the CI wanted the drugs that evening, or whether Dallas simply needed money as soon as possible.

dant who distributed 50 grams of cocaine (base offense level 16 for 50 to 100 grams) deserves six more months of minimum punishment than a defendant who distributed 40 grams (base offense level 14 for 25 to 50 grams).[2] Whether or not selling ten (or even 50) more grams merits six more months of punishment, the Commission has promulgated its 17–layer sentencing table, and courts are obliged to apply it.[3] For Dallas, who few would doubt deserves some prison time for conspiring to sell cocaine, it must be determined whether the quantity for which he should be punished is 118.32 grams (the one-ounce plus the three-ounce sales) or 288.32 grams (the first two sales plus the challenged six-ounce aborted sale). Without the six-ounce transaction, his sentencing range, in Criminal History Category II, would have been 27–33 months (offense level 17, adjusted from 18); with the challenged transaction, his range was 33–41 months (offense level 19, adjusted from 20). For agreeing to the six-ounce transaction with the CI, Dallas has received six months' added punishment. The increment of punishment is obviously of concern to Dallas and, because of the detail and rigidity of the Guidelines, must be carefully considered by this Court.[4]

2. For defendants in Criminal History Category I, the sentencing range for offense level 16 is 21–27 months, and for offense level 14 is 15–21 months. For defendants in Criminal History Category II, the comparable ranges are 24–30 months and 18–24 months.

3. Although Congress has made gross distinctions among drug punishments by specifying different mandatory minimum sentences for different quantities, *e.g.,* ten years for more than five kilograms of cocaine and five years for more than 500 grams of cocaine, *see* 21 U.S.C. § 841(b)(1)(A)(ii)(II), (B)(ii)(II), nothing in the Sentencing Reform Act of 1984, which mandated the Guidelines, *see* 28 U.S.C. § 994(a) (1994), required the minute quantity differentiations in the Commission's drug quantity table. The Commission was obliged only to "take ... into account" various factors including "the nature and degree of the harm caused by the offense," *id.* § 994(c)(3), and to do so "only to the extent that [these factors] do have relevance," *id.* § 994(c).

The lawfulness of including the aborted six-ounce transaction in the sentencing calculation involves both an issue of law, which we review *de novo, see United States v. Stroud,* 893 F.2d 504, 507 (2d Cir.1990), and an issue of fact, which we review for clear error, *see United States v. Hazut,* 140 F.3d 187, 190 (2d Cir.1998) (reviewing for clear error determination of quantity of narcotics). The legal issue, which we consider first, concerns intent: Does a defendant's undisputed intent to sell six ounces of cocaine permit inclusion of that quantity in the calculation of the base offense level, notwithstanding the defendant's later decision to substitute a harmless substance for the cocaine he had previously agreed to sell? The factual issue, which we consider *infra,* concerns capability: Did Dallas have the capability of producing the six ounces of cocaine?

1. Legal Issue Concerning Intent

█ Application Note 12 to section 2D1.1 of the Guidelines provides the starting point for our analysis. One sentence of Note 12 states:

In an offense involving an agreement to sell a controlled substance, the *agreed-upon quantity* of the controlled sub-

4. Since 33 months is both the top of the range for offense level 17, which Dallas seeks, and the bottom of the range for offense level 19, in which he was placed, the sentencing judge could have eliminated the dispute concerning the challenged six-ounce transaction if the judge had thought that 33 months would have been the appropriate sentence, regardless of which of the two offense levels applied. *See United States v. Bermingham,* 855 F.2d 925, 934–35 (2d Cir.1988). From both the absence of any indication of such a thought and the sentencing of Dallas at the bottom of the range for level 19, we may reasonably infer that Dallas would have been sentenced to 27 months, the bottom of the range for level 17, if that range had been applicable. Moreover, the Government, as required by the plea agreement, recommended sentencing at the bottom of the applicable guideline range, although this recommendation did not bind the sentencing judge.

stance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. U.S.S.G. § 2D1.1, comment. (n.12) (1998) (emphasis added). This sentence, read in isolation, indicates that Dallas may be sentenced for the disputed six ounces because his offense involved an agreement to sell a controlled substance and the six ounces was part of the "agreed-upon quantity." *See, e.g., United States v. Pimentel,* 932 F.2d 1029, 1032 (2d Cir.1991) (defendants sentenced for two kilograms they agreed to sell, even though they were delivering only one kilogram when arrested).

However, Application Note 12 continues: If, however, the defendant establishes that he or she did not intend to provide, *or* was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

U.S.S.G. § 2D1.1, comment. (n.12) (emphasis added). This provision, added in 1995, *see* U.S.S.G.App. C at 341, 344 (amend. 518), amended the prior version of Note 12 to make lack of either intent or capability a ground for reducing the quantity for which a defendant could be sentenced. *See Hazut,* 140 F.3d at 193. The previous Note 12 had permitted a reduction of quantity only if a defendant lacked both intent and capability. *See* U.S.S.G.App. C at 342 (amend. 518).

■ The amended Note 12 also somewhat resolved the previously existing issue of which side has the burden of proof concerning intent and capability. Although the amended Note seems to require the defendant to prove lack of intent or capability, this Court has construed the amended Note to impose on the defendant

only a *burden of production. See Hazut,* 140 F.3d at 191–92. As *Hazut* explained, there are shifting burdens of proof. The Government first has to demonstrate by a preponderance of the evidence that the defendant intended to provide the buyer with the alleged amount of drugs, *see id.* at 191, and was reasonably capable of providing that amount, *see id.* at 193. The defendant then "must *produce* evidence tending to establish lack of intent or inability to deliver the alleged quantity of drugs." *Id.* (emphasis added). The defendant must offer more than simply counsel's argument that he lacked intent and ability. *See id.* at 192. If the defendant meets this burden of production, the burden of proof shifts back to the Government: "the ultimate burden of proof with respect to intent and ability rests with the government." *Id.* at 192; *see id.* at 193.[5]

■ In the pending case, the legal issue arising under amended Application Note 12 is whether an intent once formed and expressed satisfies the intent requirement even though the defendant later changes his mind and acts without such intent, in this case, by selling flour instead of the originally intended cocaine. The Appellant first contends that "there was no intent by this defendant to sell a controlled substance on the date in question [*i.e.,* August 6, the date of the planned sale of flour]." Brief for Appellant at 10. The Appellant must be referring to a claimed lack of intent on the *evening* of August 6, after he and Heyward had decided to substitute flour for cocaine; it is undisputed that earlier on that day, when Dallas agreed with the CI to sell him six ounces of cocaine, he and Heyward had the requisite intent. An agreement to produce a specific amount evidences an intent to produce it. *See United States v. Desimone,* 119 F.3d 217, 229 (2d Cir.1997)("[N]egotiations ordinarily constitute reliable admissions as to a defendant's intent to produce a particular quantity of narcotics in the course of a

**5.** A third change effected by amended Note 12 is the substitution of the phrase "agreed-upon amount" as the starting point for the base level determination instead of the previously used phrase "weight under negotiation." *See* U.S.S.G.App. C, at 342 (amend.518).

conspiracy."); *United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir.1994); [6]; *Pimentel*, 932 F.2d at 1031–32 (intent to deliver two kilograms found even though defendants delivered only one because defendants had agreed to deliver the second kilogram if "all went well"). Moreover, there was evidence that the conspirators acted to carry out their intent when Heyward tried to obtain the six ounces of cocaine from her source.

Apparently acknowledging his initial intent to sell the six ounces, the Appellant presses his legal argument in these words: "However, to the extent that he has taken steps to withdraw from the conspiracy and put an end to future distributions, he should not be held accountable for quantities with which he was not involved." Reply Brief for Appellant at 4.

■ A person can withdraw from a conspiracy " 'either [by] making ... a clean breast to the authorities ... or communicati[ng] ... the abandonment in a manner reasonably calculated to reach coconspirators.' " *United States v. Salameh*, 152 F.3d 88, 150 (2d Cir.1998) (quoting *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964)). Even if we were to make the highly debatable assumption that Dallas withdrew from the conspiracy by deciding to sell flour to the CI,[7] withdrawal from a conspiracy serves only to end a conspirator's liability for acts taken thereafter by another conspirator. *See United States v. Read*, 658 F.2d 1225, 1232 (7th Cir.1981). The Appellant cites no case, and we are aware of none, holding that withdrawal ends a conspirator's liability for the conspiracy prior to the time of withdrawal. Although a defendant who decides not to act upon a previously formed intent to commit a substantive offense avoids criminal liability for the substantive offense that was not committed,[8] conspiracy law maintains a conspirator's liability once a conspiracy has been formed and a defendant has joined it. *See United States v. LoRusso*, 695 F.2d 45, 55 n. 5 (2d Cir.1982) ("We have never viewed withdrawal from a conspiracy as a defense to a conspiracy count directed at the period prior to withdrawal...."); *Read*, 658 F.2d at 1232 (after withdrawal, defendant "is still liable ... for his previous agreement"). Abandoning the intent to contin-

6. *Hendrickson* was focusing on intent for a somewhat different purpose than the mitigating language of Application Note 12, which permits exclusion, from the quantity used to determine the base offense level, of any quantity that the defendant did not intend to distribute. In *Hendrickson*, the Court was applying former section 2D1.4, which specified that the base-offense level quantity in a narcotics conspiracy was determined by the "object" of the conspiracy. *See* 26 F.3d at 332. *Hendrickson* ruled that this amount was the amount that at least some "culpable" conspirators had agreed to, even though the defendant being sentenced might have agreed to a smaller amount. *See id.* at 334. To determine the amount that was the "object" of the conspiracy, *Hendrickson* focused on the "agreement, hence intent" of these "culpable" conspirators. *Id.* In partial dissent, Judge Winter disagreed that, to punish any one defendant, the Government was obliged to prove that some group of the conspirators had agreed to a specific quantity that was the object of the conspiracy. *See id.* at 342–45

(Winter, J., concurring in part and dissenting in part). Whether, for punishment purposes, the need to consider intent to determine the object of the conspiracy has survived the Guidelines' elimination of section 2D1.4 and the 1995 revision of Application Note 12 is a matter we need not consider.

7. Although Dallas communicated to Heyward his decision to sell the CI flour, it is not so clear that he withdrew from the agreement to sell cocaine, including the six ounces originally planned to be sold to the CI. He contends that a future sale to the CI was impossible, once the fake cocaine was discovered, but the charged offense, a conspiracy to sell cocaine, was not limited to a particular buyer, and, if it became relevant, Dallas could have been found to have continued to intend to sell six ounces of cocaine to a subsequent buyer, notwithstanding his decision to fool the CI.

8. We have no occasion to consider whether in some circumstances such a defendant might remain liable for an attempt.

ue with the conspiracy does not unring the bell; as long as the elements of the conspiracy offense have been established, the prior intent renders Dallas liable for conviction for conspiracy under criminal law and liable for punishment under the Guidelines for the amount of narcotics that he agreed and, at one time, intended to sell.

### 2. Factual Issue Concerning Capability

■ The factual issue arising under Application Note 12 is whether the Government has sustained its burden of proving that Dallas was "reasonably capable" of providing six ounces of cocaine.[9] Chief Judge Murtha found such reasonable capability, and, although such a finding was not inevitable, we cannot say that it was clearly erroneous. Dallas had previously shown himself capable of producing one ounce of cocaine on one occasion and three ounces on another, although it took some time to obtain these quantities. *See Hazut,* 140 F.3d at 193 (capability to provide large quantity of pills inferable partly from previous provision of smaller quantity). The six ounces that he agreed to produce is somewhat more than the previous amounts that he had obtained, but within the range of single-digit quantities. Although Heyward failed in her attempt to obtain the six ounces from her usual source in time to obtain the anticipated money from the CI on the evening of August 6, Chief Judge Murtha was entitled to find that this momentary set-back did not negate Dallas's capability on August 6 to produce the six ounces, if not that very day, then within a reasonable time thereafter.[10] The inference of such reasonable capability was available from the defendant's previous ability on two occasions to obtain comparable amounts after brief delays.

### Conclusion

Since Dallas agreed to sell the disputed six ounces of cocaine and had the intent and capability to do so, his punishment calculation properly included this amount. The judgment of the District Court is affirmed.

---

9. We note that the Guidelines' exclusion from the base level amount of a quantity that a defendant is not reasonably capable of producing is an instance where punishment law is more lenient than the law determining criminal responsibility. As we stated in *United States v. Wallach,* 935 F.2d 445 (2d Cir. 1991):

"[I]t does not matter that the ends of the conspiracy were from the beginning unattainable.... The central question becomes whether the government's proof could establish that the accused planned to commit a substantive offense which, if attainable, would have violated a federal statute, and that at least one overt step was taken to advance the conspiracy's purpose."

*Id.* at 470–71 (quoting *United States v. Giordano,* 693 F.2d 245, 249 (2d Cir.1982)); *see* U.S.S.G. § 1B1.3, comment. (n.1) ("The principles and limits of sentencing accountability under this [relevant conduct] guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or·conspirator.").

10. To the extent that this assessment of present capability to produce the quantity within a reasonable time includes a legal issue as to whether the defendant was *"reasonably* capable," *see* U.S.S.G. § 2D1.1, comment. (n.12) (emphasis added), the ultimate finding was sustainable.