UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Charles L. JACKSON, Defendant–
Appellant–Cross–Appellee.

Docket Nos. 02–1283, 02–1303.

United States Court of Appeals,
Second Circuit.

Argued: March 28, 2003.
Decided: June 30, 2003.

---

Fred S. Gallina, Gallina Law Offices, Rochester, NY, for Defendant–Appellant–Cross–Appellee.

Christopher P. Tuite, Assistant United States Attorney, for Michael A. Battle, United States Attorney for the Western District of New York, Rochester, NY, for Appellee–Cross–Appellant.

Before: McLAUGHLIN and B.D. PARKER, Circuit Judges, and GOLDBERG, Judge.[*]

McLAUGHLIN, Circuit Judge.

This appeal presents two significant issues: (1) whether statements, made by a co-conspirator at his plea allocution, that arguably exculpate the defendant are admissible at the defendant's trial; and (2) whether a jury determination as to the quantity of cocaine attributable to the defendant's conspiracy was supported by the trial evidence.

After a trial in the United States District Court for the Western District of New York (Larimer, *J.*), a jury found defendant Charles L. Jackson guilty of conspiring to import 5 kilograms or more of cocaine into the United States. Although the district court denied Jackson's motion for acquittal as to the conspiracy, it did grant Jackson's motion for acquittal as to the jury's drug quantity determination. The court concluded that Jackson was guilty of the lesser-included offense of conspiracy to import between 500 grams and 5 kilograms of cocaine.

Jackson challenges his conviction on evidentiary grounds. He contends that the court abused its discretion in refusing to admit the entire plea allocution of co-conspirator Steve Brown. The Government cross-appeals the district court's grant of Jackson's motion of acquittal on drug quantity, contending that a reasonable jury could easily have found that Jackson's conspiracy involved at least 5 kilograms of cocaine.

We find Jackson's evidentiary challenge meritless. We also conclude that the district court erred in granting Jackson's Rule 29 motion because there was more than sufficient evidence for a jury to find that Jackson conspired to import 5 or more kilograms of cocaine. Accordingly, we vacate the district court's grant of Jackson's Rule 29 motion and remand to the district court for resentencing in accordance with the jury's verdict.

## BACKGROUND

Jackson, Steve Brown, and Sincerray Gina Sullivan were charged in a Superseding Indictment with one count of conspiracy to import 5 or more kilograms of cocaine into the United States between October 1998 and March 2000, in violation of 21 U.S.C. §§ 952(a), 963 & 960(b)(1)(B). Brown and Sullivan ultimately pled guilty to this charge, as did several other co-conspirators in a series of separate cases.

## I. *The Government's Case*

The proof at trial established that Brown and Lionel Guthrie ran an organization that hired couriers from Rochester, New York to smuggle cocaine from Jamaica into the United States. The Government called four co-conspirators to prove the existence of the conspiracy and to describe Jackson's role as a drug courier. Lewis Snowden, Shatrina Jackson (a distant relative of the defendant), Lakisha

[*] The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

Sinkler, and Sullivan explained how the smuggling operation worked: Brown provided his couriers with all-expense-paid round trips to Jamaica. Before leaving Jamaica, the couriers were given pellets of cocaine, which they swallowed or hid on their persons. Back in Rochester, the couriers were paid for their efforts based on how much cocaine they imported, typically from one-half to 1 kilogram.

The testimony of Lakisha Sinkler was the most extensive. Sinkler, Jackson's longtime girlfriend and the mother of one of his children, testified that she went on two smuggling trips to Jamaica with Jackson, as well as four smuggling trips on her own. These trips were coordinated and financed by Brown. Sinkler made her first smuggling trip in October 1998. Brown promised Sinkler that she would be paid $2,500 for importing half a kilogram of cocaine and $5,000 for a whole kilogram. Sinkler flew to Jamaica, ingested cocaine tablets that she got from Brown's co-conspirators, and was paid $2,500 upon her return.

Two months later, Jackson accompanied Sinkler on her second smuggling trip to Jamaica. Jackson agreed to join her on this trip after discussing with her and Brown how much cocaine Jackson would be asked to import and the money he could expect for his efforts. Prior to her second trip, Sinkler and Jackson obtained their birth certificates together in Rochester; and Brown gave them spending money and round-trip plane tickets to Jamaica. Sinkler and Jackson then flew to Jamaica, stayed at the same hotel for a week and, on the night before their departure, swallowed the cocaine pellets they were given. Sinkler estimated that Jackson swallowed over 100 cocaine pellets. Sinkler herself ingested about 40 pellets and carried the remaining pellets in her undergarments. When they landed in Rochester, they were picked up at the airport by Brown and his girlfriend, co-conspirator Gina Sullivan. They went to Sinkler's house, took laxatives, and passed the cocaine pellets. The following day, Sinkler was paid between $1,800 and $2,000, while Jackson received $5,000 for his efforts.

Jackson took his second smuggling trip to Jamaica two months later. According to Sinkler, Jackson went on this February 1999 smuggling trip alone because Brown wanted only a kilogram of cocaine and did not want to spend the money on trips for two. Having stayed in Jamaica for a few days, Jackson returned to Rochester where Brown met him at the airport. Brown dropped Jackson off at Sinkler's house. There Jackson passed over 100 cocaine pellets. Sinkler's best recollection was that Brown paid Jackson $5,000 for this trip.

Sinkler took her third smuggling trip to Jamaica in May 1999, this time going alone. Brown paid her between $1,800 and $2,000 to smuggle slightly less than half a kilogram of cocaine.

According to Sinkler, she and Jackson took their second joint smuggling trip in August 1999. As with their December 1998 trip, Brown provided the round-trip plane tickets and spending money in advance. They stayed at the same hotel while in Jamaica, swallowed and hid cocaine on their persons, and flew back to Rochester together. On their return flight, Jackson encountered co-conspirator Shatrina Jackson along with her smuggling companion, Kyshea Talbert. During a short discussion with Shatrina, Jackson learned that Shatrina and Talbert were also in the process of smuggling cocaine from Jamaica on behalf of both Brown and Lionel Guthrie. Once back in Rochester, Sinkler was paid about $2,500, and Jackson was paid $5,000.

Sinkler also testified that, at some point in 1999, Jackson became dissatisfied with the money they were getting for their smuggling efforts. He told her that they should ask for more money because the "key and a half" of cocaine they were smuggling on each trip had a street value of about $60,000.

Jackson agreed to go on another smuggling trip to Jamaica with Sinkler in November 1999. As with the earlier trips, Brown provided Sinkler and Jackson with round-trip plane tickets and spending money. The very night before they were set to leave, however, Jackson told Sinkler that he could not make the trip because another woman was giving birth to his child. Sinkler ultimately went on this scheduled trip to Jamaica alone. Upon her return to Rochester, Brown paid her $2,500 for smuggling cocaine in her undergarments.

Gina Sullivan corroborated Sinkler's version of all these events. Sullivan testified that she was present when Jackson met with Brown the night before Jackson was scheduled to leave and heard Jackson tell Brown that he would have to postpone his scheduled trip for one week. When Brown later told Guthrie about Jackson's change in plans, Guthrie was disappointed, stating that Jackson was "like a dump truck" because he could bring a kilogram of cocaine back from Jamaica at one time.

Jackson eventually rescheduled his own trip to Jamaica for sometime in December 1999. The night before he was scheduled to leave, however, he again suffered cold feet. He balked because of "bad feelings" about the trip, and offered to repay Brown the up-front money he had already spent. Jackson later reneged, telling Sullivan that Brown would just have to take it as a loss. Jackson later had Sinkler return Jackson's unused plane tickets to Brown.

Some few months later, Jackson told Sinkler that he had made his last smuggling trip. Sinkler, however, accepted another smuggling assignment in March 2000. On her re-entry into the United States, she was arrested by U.S. Customs and was found to possess 498 grams of cocaine. She began cooperating with investigators immediately and ultimately pled guilty pursuant to a cooperation agreement with the Government.

Like Sinkler, Shatrina and her smuggling companion, Kyshea Talbert, were apprehended by U.S. Customs in December 1999 following a trip to Jamaica. They possessed about 1.2 kilograms and 698 grams of cocaine, respectively. Shatrina, too, pled guilty pursuant to a cooperation agreement with the Government.

Besides the testimony of the co-conspirators, the Government elicited testimony from veteran U.S. Customs Inspector William Walker regarding narcotics smuggling. Walker testified that couriers such as Jackson are capable of ingesting a full kilogram of narcotics at a time.

The Government put into evidence about 3 kilograms of the cocaine it had seized from Sinkler, Shatrina, and other couriers during the course of the conspiracy. In addition, the Government put into evidence customs, travel agency, bank and other documentary records relating to the series of smuggling trips taken by Sinkler and Jackson.

At the close of the Government's case, Jackson moved pursuant to Rule 29 for a judgment of acquittal. The district court denied the motion as to the conspiracy charge, but reserved decision on the pivotal issue of drug quantity.

## II. *Jackson's Defense*

Jackson made an effort to admit Steve Brown's entire plea colloquy under Feder-

al Rules of Evidence 804(b)(1) & (b)(3) based on Brown's unavailability to testify. The Government indicated that it would not oppose Jackson's application under Fed.R.Evid. 804(b)(3) if the colloquy was limited to those portions that were self-inculpatory of Brown. Defense counsel, however, sought to admit the *entire* plea colloquy, particularly those portions that appeared to exculpate Jackson in addition to Brown. The district court denied Jackson's application.

### III. *The Jury Verdict*

After both sides rested, the district court instructed the jury on the elements of the charge. With respect to drug quantity, the court instructed the jury that Jackson was responsible for the quantity of drugs that he himself conspired to import plus the amount of drugs that other conspirators conspired to import if Jackson knew of the importation or could reasonably foresee that other co-conspirators were conspiring to import certain quantities of cocaine:

> Mr. Jackson's only responsible for the amount of drugs for which he knew or reasonably should have known about. It must have been known or reasonably foreseeable to him that his co-conspirators would import drugs and a certain quantity of drugs. In considering and answering that question, you may consider the amount of drugs Mr. Jackson imported when this conspiracy began, when he became a member of it, what he did, whether he knew all the other co-conspirators, and whether he knew about the drugs that were imported by other co-conspirators, and were other drugs that were involved, were they in furtherance of the conspiracy.

At the conclusion of its instructions to the jury, the district court gave the jury a series of lesser-included offenses which varied from the charge in the Indictment only with respect to the amount of cocaine involved in the conspiracy. The jury, apparently crediting the testimony of the co-conspirators, returned a guilty verdict on the top count: conspiracy to import 5 or more kilograms of cocaine. This quantity is vigorously contested on appeal.

### IV. *Jackson's Rule 29 Motion for Acquittal*

After trial, the district court invited submissions from the parties on Jackson's pending Rule 29 motion for acquittal on the issue of how much cocaine was attributable to him. Jackson argued that the evidence failed to support the jury finding that he conspired to import 5 or more kilograms of cocaine. The Government, on the other hand, contended that a rational juror could easily have found that Jackson conspired to import 5 or more kilograms of cocaine.

The controversy over drug quantity was hardly academic. Under statute, Jackson faced a mandatory minimum of 10 years' imprisonment since the jury found his conspiracy involved 5 or more kilograms of cocaine. *See* 21 U.S.C. § 960(b)(1)(B). If the amount of cocaine attributable to Jackson were less than 5 kilograms, however, his statutory mandatory minimum was only 5 years' imprisonment. *See* 21 U.S.C. § 960(b)(2)(B).

After oral argument, the district court granted Jackson's Rule 29 motion, concluding that a reasonable juror could find that, at most, Jackson conspired to import only between 3.5 and 5 kilograms of cocaine. Therefore, the court threw out Jackson's conviction and instead found Jackson guilty of the lesser-included charge of conspiring to import between 500 grams and 5 kilograms of cocaine.

In arriving at this decision, the court reasoned that Sinkler's testimony about

the cocaine that Jackson himself smuggled was speculative and imprecise. The court further noted that the evidence did not support the finding that Jackson was aware of all of the trips that Sinkler and Shatrina had taken, let alone "the quantity [of cocaine] that they brought in." Therefore, in the face of what it termed "the estimation or opinion and imprecise calculation[s]" of witnesses who "were not scientists or mathematicians," the court concluded that the proof at trial was too speculative to sustain the jury's verdict.

After rejecting Jackson's motion for a downward departure based on extraordinary family circumstances, the court sentenced Jackson to 87 months' imprisonment and a 5 year term of supervised release.

This appeal ensued.

## DISCUSSION

### I. The Exclusion of Brown's Plea Allocution Statements

On appeal, Jackson contends that the district court improperly excluded Brown's plea allocution at trial. Specifically, Jackson challenges the exclusion of Brown's statement that Brown never supervised Jackson. He argues that Brown's plea allocution should have been admitted under one of the following exceptions to the hearsay rule: (1) former testimony; (2) statements against penal interest; or (3) the residual hearsay exception. None of these contentions has merit.

### A. Brown's Plea Allocution

It is not without significance that Brown's plea allocution was internally inconsistent as to the relationship between Brown and Jackson during the conspiracy. Brown's signed plea agreement expressly stated that Brown managed and supervised various couriers, including Jackson.

At his oral plea allocution, the district court asked Brown whether this statement from his plea agreement was true; Brown responded that it was indeed true. The district court then specifically asked Brown whether he had any arrangements with Jackson to bring drugs into the country. Again, Brown said yes.

To be sure, later in his plea allocution, Brown claimed that he never supervised Jackson or requested that Jackson go to Jamaica. When asked to clarify his relationship with Jackson in light of his previous admission—both minutes earlier and in his written plea agreement—that he had indeed supervised Jackson during the conspiracy, Brown waffled once again. Brown now claimed that Jackson smuggled cocaine only for Guthrie. Brown later conceded, however, that Guthrie was the overall director of the smuggling operation and that he worked together with Guthrie and others.

### B. Standard of Review

█ We review the district court's evidentiary rulings for abuse of discretion. See, e.g., United States v. Yousef, 327 F.3d 56, 156 (2d Cir.2003) (per curiam). The district court has broad discretion regarding the admission of evidence, and the court's evidentiary determinations will be reversed only if they are "manifestly erroneous." United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 87 (2d Cir.1999). Generally, we will not overturn a district court's evidentiary rulings unless the court "acted arbitrarily or irrationally." Id. at 88 (quoting United States v. Blanco, 861 F.2d 773, 781 (2d Cir.1988)).

### C. Former Testimony

█ Under Rule 804(b)(1), an unavailable witness's testimony from a prior hearing or proceeding is not barred by the hearsay rule

if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Fed.R.Evid. 804(b)(1). This requirement "operates to screen out those statements, which although made under oath, were not subject to the scrutiny of a party interested in thoroughly testing [their] validity." *United States v. Pizarro*, 717 F.2d 336, 349 (7th Cir.1983).

Here, both sides concede that Brown was unavailable at Jackson's trial because he had properly invoked his Fifth Amendment right against self-incrimination. *See, e.g., United States v. Dolah*, 245 F.3d 98, 102 (2d Cir.2001) ("It is settled in this Circuit that a witness who invokes the privilege against self-incrimination is 'unavailable' within the meaning of Rule 804(b) ....").[1] Therefore, the core issue we must address is whether the Government had an opportunity and similar motive to examine Brown at his plea allocution. Although we have not had occasion to address this issue, two of our sister circuits have found that the Government has neither the opportunity nor a similar motive to examine a defendant at a plea allocution as it has at trial. *See United States v. Powell*, 894 F.2d 895, 901 (7th Cir.1990); *United States v. Lowell*, 649 F.2d 950, 965 (3d Cir.1981).

Although Jackson concedes in his reply brief that "[o]pportunity and motive to examine the declarant [at a plea allocution] may not technically be the same as at a trial," he nevertheless contends that the Government did have the requisite opportunity and motive here. Jackson attributes great weight to the fact that the Government was permitted to ask Brown one follow-up question during Brown's plea allocution regarding Brown's supervisory role over Jackson. Jackson's attempt to equate the Government's function and motives during a plea allocution with those at trial reflects a misguided view of the nature and purpose of plea proceedings.

### 1. Opportunity

Under Fed.R.Crim.P. 11, the purpose of a plea proceeding is to ensure that the defendant's plea is knowing, voluntary, and grounded on a proper factual basis. *See* Fed.R.Crim.P. 11(b); *Mitchell v. United States*, 526 U.S. 314, 322–24, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999). Under the Rule, a plea proceeding is conducted solely by the district court judge who is primarily responsible for ensuring that the requirements of Rule 11 are satisfied. On the rare occasion where the prosecutor is permitted to address the defendant, the questions posed are usually formulaic and perfunctory. The Government's role at a plea proceeding is quite limited, and certainly does not include the opportunity to engage in the type of examination contemplated by Rule 804(b)(1). *See* 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 804.04[3][a], at 804–33 (Joseph M. McLaughlin ed., 2d ed. 2003) ("If the opportunity to cross-examine [is] lacking, the prior testimony must be excluded."). As Judge Larimer wisely noted, if the rule were otherwise, plea colloquies would consume pages of examination exploring the minutiae of the defendant's conduct.

---

**1.** Although he had already pled guilty, Brown had not yet been sentenced at the time of Jackson's trial. It is well established that a witness may invoke his Fifth Amendment right, and is therefore unavailable for purposes of Rule 804(b), during the time lapse between his plea and sentencing. *See, e.g., United States v. Bahadar*, 954 F.2d 821, 824 (2d Cir.1992).

### 2. Similar Motive

Nor does the Government have a similar motive to examine a defendant at a plea allocution as it has at trial. We have held that the proper inquiry in assessing similarity of motive under Rule 804(b)(1) is to determine "whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." *United States v. DiNapoli,* 8 F.3d 909, 914–15 (2d Cir.1993) (*en banc*). Moreover, "[i]f a fact is critical to a cause of action at a second proceeding but the same fact was only peripherally related to a different cause of action at a first proceeding, no one would claim that the questioner had a similar motive at both proceedings to show that the fact had been established (or disproved)." *Id.* at 912.

We agree with the Third and Seventh Circuits that the Government does not have the same motive to examine the defendant at a plea hearing as it does at other proceedings. *See United States v. Lowell,* 649 F.2d 950, 965 (3d Cir.1981); *United States v. Powell,* 894 F.2d 895, 901 (7th Cir.1990). Here, the Government had no reason to cross-examine Brown at his plea allocution about his supervision over Jackson. That Brown's plea colloquy may have included misstatements or inaccuracies did not preclude it from providing an adequate factual basis for the plea. *See Lowell,* 649 F.2d at 965 (co-defendant's "denial of receipt of payment from [defendant], even if it were untrue, did not deprive his plea of guilty on the conspiracy charge of a 'factual basis'"). The district court, therefore, did not abuse its discretion in excluding Brown's plea allocution under Rule 804(b)(1).

### D. Statement Against Penal Interest

Jackson's contention that Brown's plea allocution might be admissible under Rule 804(b)(3) is a stronger argument, but it too is ultimately without merit.

Rule 804(b)(3) allows the admission of a hearsay statement by an unavailable witness if that statement

> at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Fed.R.Evid. 804(b)(3). This exception rests on the notion that "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

Rule 804(b)(3) further requires that, if the statement exposes the declarant (*i.e.* Brown) to criminal liability and is offered to exculpate the accused (*i.e.* Jackson), the proponent of the statements must identify "corroborating circumstances [that] clearly indicate the trustworthiness of the statement." *Id.* at 605, 114 S.Ct. 2431. The purpose of this corroboration requirement is to "circumvent[ ] fabrication" by the declarant. *See* Fed.R.Evid. 804(b)(3) Advisory Committee Notes. To effectuate this purpose, we require corroboration of "both the *declarant's* trustworthiness as well as the *statement's* trustworthiness." *United States v. Bahadar,* 954 F.2d 821, 829 (2d Cir.1992) (emphasis in original).

Although we have recognized that statements from a guilty plea allocution can be admitted under Rule 804(b)(3), *see, e.g., United States v. Gallego,* 191 F.3d 156, 166–68 (2d Cir.1999) (portions of co-conspirator's plea properly admitted solely to establish a conspiracy), their admission is strictly circumscribed by the Supreme

Court's holding in *Williamson v. United States, supra.* In *Williamson,* the Supreme Court found that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." 512 U.S. at 600–01, 114 S.Ct. 2431. In *Williamson's* wake, we have repeatedly emphasized that each particular hearsay statement offered under Rule 804(b)(3) must be separately parsed and must, itself, be self-inculpatory. *See, e.g., United States v. Tropeano,* 252 F.3d 653, 658 (2d Cir.2001); *United States v. Sasso,* 59 F.3d 341, 349 (2d Cir.1995).

■ Here, Jackson cannot satisfy Rule 804(b)(3). Most significantly, the statements by Brown that Jackson sought to introduce at trial were not themselves self-inculpatory as to Brown. They did not, therefore, satisfy *Williamson.* Brown's statements that he never supervised Jackson and never asked Jackson to go to Jamaica to smuggle drugs did not in any way inculpate Brown or expose him to criminal liability. Accordingly, the separate guarantee of trustworthiness required by Rule 804(b)(3) is non-existent as to these statements. If anything, these statements were probably exculpatory as to Brown as they minimized the number of people that he supervised during the conspiracy.

Moreover, even if Brown's statements could be construed as self-inculpatory, Jackson has failed to satisfy the corroboration requirement of Rule 804(b)(3). There is no question that during his plea allocution Brown made conflicting assertions about Jackson's role in the conspiracy. For example, Brown first asserted that Jackson was a person with whom he had arrangements to smuggle drugs into the country. At another point, however, Brown claimed that Jackson smuggled cocaine into the country only for Guthrie.

These inconsistencies "would properly make any district judge suspicious of the statement[s'] reliability." *Bahadar,* 954 F.2d at 829.

Finally, as Judge Larimer observed, Brown's own motives for making the statements exculpating Jackson were highly suspect. Because Brown was aware at the time of his plea that there was a possibility that he could be called upon to testify at Jackson's trial (he was on the Government's witness list), the district court sagely noted that Brown's apparent attempt to exculpate Jackson may well have been an effort to avoid testifying against one of his co-conspirators.

Accordingly, the district court did not abuse its discretion in failing to admit Brown's plea allocution statements under the Rule 804(b)(3) exception to the hearsay rule.

### E. *Residual Exception*

■ Jackson's final evidentiary contention, that Brown's plea allocution satisfies the residual exception to the hearsay rule, requires little discussion. Rule 807 provides that statements not covered by Rule 803 or 804 "but having equivalent circumstantial guarantees of trustworthiness" are not excluded by the hearsay rule if they meet certain requirements. Here, because Brown's plea allocution statements lacked corroborating circumstances indicating their trustworthiness under Rule 804(b)(3), the statements clearly lack "equivalent circumstantial guarantees of trustworthiness" required under Rule 807. *See id.*

### II. *Jackson's Rule 29 Motion: Quantity of Drugs*

On cross-appeal, the Government seeks to reverse the district court's partial granting of Jackson's Rule 29 motion. The Government focuses on the evidence regarding the specific cocaine that: (1) Jack-

son himself conspired to import; (2) Sinkler conspired to import on her smuggling trips to Jamaica with Jackson; and (3) Sinkler and other co-conspirators of whom Jackson had knowledge and could reasonably foresee would import cocaine. The Government maintains that this evidence provided a basis for a rational jury to conclude that Jackson conspired to import cumulatively 5 *or more* kilograms of cocaine. Thus, the Government contends the district court erred by setting aside the jury's verdict that defendant was responsible for importing 5 or more kilograms of cocaine.

### A. Standard of Review

 We review *de novo* a district court's grant of a Rule 29 motion based on a finding that the trial evidence was insufficient to support the jury's verdict. *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999). On appeal, we apply the same standard as the district court applied in its review of the evidence. *Id.* Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Fed.R.Crim.P. 29(a), (c); *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir.2002).

A defendant who challenges the sufficiency of the evidence to support his conviction "bears a heavy burden." *United States v. Finley*, 245 F.3d 199, 202 (2d Cir.2001). Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, *Guadagna*, 183 F.3d at 129, but the jury verdict must be upheld if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307,

319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). In other words, a court may grant a judgment of acquittal only "if the evidence that the defendant committed the crime alleged was nonexistent or . . . meager." *Guadagna*, 183 F.3d at 130 (internal quotations omitted).

We have emphasized that courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal. *Id.* at 129 ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.") (internal quotations omitted). Indeed, it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence. *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir.1995). The traditional deference accorded to a jury's verdict "is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992) (internal quotations and citation omitted). Finally, we bear in mind that the jury's verdict may rest entirely on circumstantial evidence. *Martinez*, 54 F.3d at 1043.

 Jackson was convicted of conspiracy to import 5 or more kilograms of cocaine into the United States. As required by *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *United States v. Thomas*, 274 F.3d 655 (2d Cir.2001) (*en banc*), the jury determined drug quantity as an element of the offense. Jackson does not challenge the jury's finding that he participated in a conspiracy to import cocaine. Therefore, we deal solely with the quantity of cocaine the jury at-

tributed to Jackson's conspiracy. Under well-established law, Jackson was responsible not only for the cocaine that he himself conspired to import but also for the cocaine his co-conspirators conspired to import, provided he knew of his co-conspirator's illicit activities or the activities were reasonably foreseeable by him. *See, e.g., United States v. Martinez,* 987 F.2d 920, 923–26 (2d Cir.1993).

Applying these standards, we find that there is ample support for the jury's conclusion that Jackson conspired to import 5 or more kilograms of cocaine.

**B.** *Cocaine Attributable to Jackson's Own Smuggling Efforts*

Viewing the evidence in the light most favorable to the Government and drawing all inferences in the Government's favor, as we must, there can be no dispute that a rational jury could have found that Jackson personally conspired to import 1 kilogram of cocaine on each of his three trips to Jamaica. This conclusion is consistent with Sinkler's testimony that Brown paid Jackson $5,000—the agreed price for importing 1 kilogram of cocaine—after each of his three trips to Jamaica (in December 1998, February 1999, and August 1999). This conclusion is also supported by Sinkler's personal observations as to the number of pellets Jackson swallowed and excreted on his trips to Jamaica.

Additional support that the 3 kilograms are attributable to Jackson for his own Jamaica trips is found in his complaints to Sinkler that they were being underpaid for the "key and a half" they were collectively smuggling on each trip. According to Sinkler, Brown also requested that Jackson travel to Jamaica alone in February 1999 because he needed only 1 kilogram of cocaine. Finally, this conclusion is bolstered by the comment of Guthrie, who it is fair to infer was familiar with Jackson's

smuggling skills, that Jackson was like a "dump truck" because he was capable of smuggling a whole kilogram of cocaine at a time.

A rational jury could also have found Jackson responsible for another 1 kilogram of cocaine in connection with his cancelled trip to Jamaica in November 1999. Our decision in *United States v. Dallas,* 229 F.3d 105 (2d Cir.2000), is instructive. In *Dallas,* we found that a defendant who had agreed to sell cocaine, but later decided to substitute flour for the cocaine, was nonetheless responsible for the amount of cocaine he had previously agreed to sell. *See id.* at 110–11. As we recognized,

> [C]onspiracy law maintains a conspirator's liability once a conspiracy has been formed and a defendant has joined it. *Abandoning the intent to continue with the conspiracy does not unring the bell;* as long as the elements of the conspiracy offense have been established, the prior intent renders [the defendant] liable for conviction for conspiracy under criminal law and liable for punishment under the Guidelines for the amount of narcotics that he agreed and, at one time, intended to sell.

*Id.* (emphasis added); *see also United States v. Rosa,* 17 F.3d 1531, 1543 (2d Cir.1994) ("What matters in a conspiracy prosecution is whether the defendants agreed to commit the underlying offense, not whether their conduct would actually have constituted that offense.").

 A member of a conspiracy is therefore liable for an act he agreed to and intended to commit in furtherance of the conspiracy regardless of whether he ultimately committed the substantive act. Applying *Dallas* to this case, it is manifest that Jackson was accountable for conspiring to import 1 kilogram of cocaine—an amount consistent with his 3 previous trips

to Jamaica—even though he never actually took the trip.

Withdrawal from the conspiracy would obviously constitute an exception to our holding in *Dallas*. Here, however, Jackson cannot plausibly argue that he withdrew from the conspiracy in November or December of 1999. To withdraw from a conspiracy, a person must take some affirmative action "either [by] making ... a clean breast to the authorities ... or communicati[ng] ... the abandonment in a manner reasonably calculated to reach coconspirators." *United States v. Salameh*, 152 F.3d 88, 150 (2d Cir.1998) (internal quotations omitted). There is no evidence in the record to indicate that, at that time, Jackson did anything more than express reservations about going back to Jamaica. In fact, he rescheduled his November 1999 trip for the following month.

### C. *Jackson's Liability for Sinkler's Importation Quantities*

■■■ There is likewise no doubt that a rational jury could have found Jackson responsible for the quantity of cocaine Sinkler conspired to import on their joint trips to Jamaica in December 1998 and August 1999. Sinkler testified that she and Jackson obtained their birth certificates together prior to their first joint trip, stayed in the same hotel together, swallowed cocaine pellets together, passed the pellets at Sinkler's house together, and obtained their payments from Brown together. Given that Jackson was virtually inseparable from Sinkler during these trips, it is clear that the cocaine Sinkler conspired to import on these trips is attributable to Jackson. *Cf. United States v. Chalarca*, 95 F.3d 239, 243–44 (2d Cir. 1996) (under the Sentencing Guidelines, defendant deemed to be accountable for jointly undertaken drug transactions in which "he personally participates, in a direct way").

In light of Sinkler's testimony that Jackson complained about being underpaid for the "key and a half" of cocaine that they smuggled together, a reasonable jury could infer that Sinkler conspired to import one-half kilogram of cocaine on each of her trips to Jamaica. Sinkler's testimony that she received less than $2,500 for her December 1998 trip—which could suggest that the amount of cocaine she actually smuggled into the United States was less than half a kilogram—is of no consequence. As in all conspiracy cases, the essence of the crime is what the conspirators agreed to do, rather than what they actually did. *See, e.g., United States v. Gore*, 154 F.3d 34, 40 (2d Cir.1998) ("The essence of conspiracy is the agreement and not the commission of the substantive offense."); *United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir.1994) ("In drug conspiracies, the conspirators' agreement to produce narcotics, not the actual possession, sale or delivery of the drugs, is the essence of the crime.").

For these reasons, a rational jury could have determined that Sinkler agreed to import one-half kilogram of cocaine on each of her trips to Jamaica. This inference is also supported by the fact that Sinkler was found in possession of almost one-half kilogram of cocaine when she was arrested in March 2000.

In sum, when adding the 1 kilogram that Sinkler conspired to import on her trips with Jackson in December 1998 and August 1999 to the 4 kilograms that Jackson conspired to import in December 1998, February 1999, August 1999, and November 1999, a rational jury could find beyond a reasonable doubt that Jackson was responsible for conspiring to import 5 or more kilograms of cocaine.

D. *Cocaine Quantities Reasonably Fore-
seeable By Jackson*

Although the foregoing calcula-
tions, standing alone, are sufficient to up-
hold the jury's verdict, there is yet another
reason to vacate the district court's grant
of Jackson's Rule 29 motion: Jackson was
responsible for the amounts that Sinkler
conspired to import on her trips to Jamai-
ca without Jackson in May and November
of 1999 if those quantities were reasonably
foreseeable by him.

Under fundamental conspiracy law Jack-
son is responsible for any amount of co-
caine that his co-conspirators agreed to
import so long as these amounts were
within the scope of the conspiracy and
reasonably foreseeable by him. Here,
based on the evidence adduced at trial, a
rational jury could have determined that
the cocaine that Sinkler agreed to smuggle
in May and November 1999 lay within the
scope of Jackson's conspiratorial agree-
ment and was, therefore, reasonably fore-
seeable by him.

Even though Jackson did not accompany
Sinkler on these trips, the facts that Sink-
ler was going to Jamaica to smuggle co-
caine and the amount that Sinkler had
conspired to import on these occasions
could easily be found to be reasonably
foreseeable by Jackson. Particularly with
respect to the November 1999 trip, which
Jackson had agreed to take with Sinkler
but later postponed when his child was
born, there can be little question that
Jackson was aware of Sinkler's smuggling
activities, as well as the amount of cocaine
that she normally agreed to import on a
given trip. In short, a rational jury could
have found that Jackson was responsible
for an additional 1 kilogram of cocaine
based on Sinkler's smuggling trips in May
and November 1999.

Because of the copious evidence sup-
porting the jury's verdict that Jackson

conspired to import 5 or more kilograms of
cocaine, we need not address the Govern-
ment's additional arguments that Jackson
was responsible for cocaine smuggled by
other co-conspirators.

In sum, we hold that, under the evidence
adduced at trial, a rational jury could have
found beyond a reasonable doubt that
Jackson conspired to import 5 or more
kilograms of cocaine.

## CONCLUSION

For the foregoing reasons, the judgment
of the district court is AFFIRMED IN PART
and VACATED IN PART, and the case is
REMANDED to the district court with in-
structions to resentence Jackson in accor-
dance with the jury verdict.